In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-10604

_____

ROBERT W. OTTO,
JULIE H. HAMILTON,

Plaintiffs-Appellants,

*versus*

CITY OF BOCA RATON, FLORIDA,
COUNTY OF PALM BEACH, FL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:18-cv-80771-RLR

_____

2                                                              19-10604

Before WILLIAM PRYOR, Chief Judge, WILSON, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges.

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, it is ORDERED that this case will not be reheard en banc.

19-10604            GRANT, J., Concurring                1

GRANT, Circuit Judge, joined by BRANCH and LAGOA, Circuit Judges, concurring in the denial of rehearing en banc:

First Amendment jurisprudence is straightforward in at least one respect: it "requires that content-based speech restrictions satisfy strict scrutiny. And unless restrictions meet that demanding standard, whether the speech they target should be tolerated is simply not a question that we are allowed to consider, or a choice that we are allowed to make." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) (quotation and citations omitted). The city and county ordinances in this case, which prohibit talk therapy on a particular—and particularly controversial—subject, are no exception to this rule.

The challenged ordinances "prohibit therapists from engaging in counseling or any therapy with a goal of changing a minor's sexual orientation, reducing a minor's sexual or romantic attractions (at least to others of the same gender or sex), or changing a minor's gender identity or expression—though support and assistance to a person undergoing gender transition is specifically permitted." *Id.* at 859. The perspective enforced by these local policies is extremely popular in many communities. And the speech barred by these ordinances is rejected by many as wrong, and even dangerous. But the First Amendment applies even to—especially to—speech that is widely unpopular.

The panel opinion thoroughly explains why a fair-minded and neutral application of longstanding First Amendment law dooms the ordinances. We write separately here to address our

colleagues' dissenting opinions and to reiterate the importance of the First Amendment protections at stake. Today's dissenters decry the result of the panel decision—namely, that speech they consider harmful is (or may be) constitutionally protected. But to reach their preferred outcomes, they ask us to ignore settled First Amendment law.

Consider our well-established standard of review for First Amendment cases. When reviewing constitutional facts underlying possible violations of the freedom of speech, we apply de novo, or plenary, review. *ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 n.17, 505- –06 & 506 n.24 (1984). Judge Jordan correctly applied this standard when writing for this Court in *Wollschlaeger v. Governor of Florida*, an en banc case in which we held that the government could not block doctors from speaking to their patients about guns. *See* 848 F.3d 1293, 1301 (11th Cir. 2017) (en banc). Remarkably, he now attacks that standard, emphasizing that we ordinarily review a district court's "factual findings for clear error" in an appeal from the grant or denial of a preliminary injunction. *Indep. Party of Florida. v. Sec'y, Florida*, 967 F.3d 1277, 1280 (11th Cir. 2020). Jordan Dissent at 1.

That is true—but "First Amendment issues are not ordinary." *ACLU of Florida*, 557 F.3d at 1203. It has long been the rule that when we consider a preliminary injunction implicating the freedom of speech, "our review of the district court's findings

19-10604          GRANT, J., Concurring          3

of 'constitutional facts,' as distinguished from ordinary historical facts, is *de novo*." *Id.* (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1268 (11th Cir.2006)). Historical facts are the straightforward findings of the circumstances surrounding a case—here, for example, the dates on which the ordinances were passed. Constitutional facts, in contrast, are the "core facts" that determine whether a First Amendment violation has occurred. *Id.* at 1205.

Because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," appellate courts must ourselves decide "whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 567 (1995). Here, the question of whether the ordinances regulate speech or conduct—as Judge Jordan puts it, whether the therapy is "just talk"—goes well beyond historical fact. *See* Jordan Dissent at 13. To defer on a factual issue so intertwined with the legal questions at stake would be to implicitly delegate legal judgment to the district court as well.

We cannot duck controversial issues by evading the standard of review for constitutional facts. The panel, as our precedents require, applied the proper standard: "plenary review." *Wollschlaeger*, 848 F.3d at 1301. And we are puzzled that Judge Jordan objects to applying the same standard he used in *Wollschlaeger*.

The next dissent also ignores the law of this Circuit and the Supreme Court.  Citing dozens of interest group publications—none of which are in the record—Judge Rosenbaum criticizes the panel majority's "uninformed take on talk therapy."  Rosenbaum Dissent at 2; *see id.* at 3–7, 71–75 (citing publications).  But we are not charged with performing our own internet investigation on the questions that come before us.  In fact, doing so is out of bounds. *See, e.g., Turner v. Burnside*, 541 F.3d 1077, 1086 (11th Cir. 2008) ("We do not consider facts outside the record.").  Our role is to independently review the record, not to develop it further.

Our role is also to apply the precedents that bind us, and Judge Rosenbaum's attempts to justify the ordinances only reveal that it is impossible to do so under existing law.  To start, the dissent recognizes that ordinances like these are "necessarily content-based and would not survive the general presumption against content-based regulations and strict scrutiny."  Rosenbaum Dissent at 24.  Exactly.  As the panel opinion explains, the studies offered to the district court in support of the regulations contained "ambiguous proof" and "equivocal conclusions." *Otto*, 981 F.3d at 868–69 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 800 (2011)).  That is not enough to meet the "demanding standard" that strict scrutiny requires. *Id.* at 868 (quoting *Brown*, 564 U.S. at 799).  Indeed, the dissent also concedes that—even considering the dramatic number of interest group publications and press releases that it identifies—these specific regulations cannot survive strict

scrutiny. *See* Rosenbaum Dissent at 24, 3–7, 71–75 (interest group publications).

Because ordinary First Amendment law will displace these speech bans, creative thinking is required to save them. In its attempt to persuade the reader otherwise, the dissent misreads First Amendment precedents. Take *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*). Judge Rosenbaum cites that case as showing that the Supreme Court "permit[s] governments to impose content-based restrictions on speech with[] persuasive evidence . . . of a long (if heretofore unrecognized) tradition to that effect." Rosenbaum Dissent at 11; *NIFLA*, 138 S. Ct. 2361, 2372 (2018) (quotations omitted). Those brackets do a lot of work. Here is the unaltered quotation: "This Court's precedents do not permit governments to impose content-based restrictions on speech without '"persuasive evidence . . . of a long (if heretofore unrecognized) tradition"' to that effect." *Id.* (quoting *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (plurality opinion) (quoting *Brown*, 564 U.S. at 792)) (ellipsis in original). Again—the Supreme Court's precedents "do *not*" permit content-based speech restrictions without persuasive evidence that a long tradition of such restrictions exists.

Read correctly, *NIFLA* emphasizes that content-based regulation is heavily disfavored and that there is *no* tradition of regulating professional speech. *Id.* "As with other kinds of speech," it explains, "regulating the content of professionals' speech poses the inherent risk that the Government seeks not to

advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 2374 (quotation and brackets omitted). That is why speech does not lose First Amendment protection "merely because it is uttered by 'professionals'"—including doctors or therapists. *Id.* at 2371–72. It is impossible to rewrite *NIFLA* to make a loophole for this one category of speech bans, no matter how popular they may be.

Make no mistake: these regulations are content-based restrictions of speech, not conduct. Talk therapy is certainly a form of treatment. But it "consists—entirely—of words." *Otto*, 981 F.3d at 865. If this speech is conduct, "the same could be said of teaching or protesting," of "[d]ebating" and "[b]ook clubs." *Id.* The professional setting of this speech does not transform it into conduct. Nor does characterizing it as a "scientifically based healthcare treatment technique" governed by a standard of care. Rosenbaum Dissent at 24–25. And *NIFLA*'s refusal to recognize a lesser-protected category of "professional speech" only confirmed what this Court already understood in *Wollschlaeger*: "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." 848 F.3d at 1307 (alteration and quotation omitted); *see NIFLA*, 138 S. Ct. at 2371–75.

Having fully exhausted existing free speech doctrine, the dissent attempts to trailblaze its own. Yet again, that move is barred by precedent. The Supreme Court has admonished that the Constitution bars "any freewheeling authority to declare new categories of speech outside the scope of the First Amendment."

*Alvarez*, 567 U.S. at 722 (quotation omitted). And it reiterated that warning in *NIFLA*, reminding us that courts must be "reluctant to mark off new categories of speech for diminished constitutional protection"—especially when such categories would be exempt from "the normal prohibition on content-based restrictions." 138 S. Ct. at 2372 (quotations omitted).

Those rebukes should always be enough to induce caution. But they carry even more force here because in *NIFLA* the Supreme Court was specifically criticizing other circuit courts' approval of "professional speech" bans just like the ones we now consider. *Id.* at 2371–72 (citing *King v. Governor of New Jersey*, 767 F.3d 216, 220, 232–33 (3d Cir. 2014) (upholding a therapist speech ban virtually identical to the ones here after concluding that "a licensed professional does not enjoy the full protection of the First Amendment when speaking as part of the practice of her profession"), and *Pickup v. Brown*, 740 F.3d 1208, 1222, 1227–1229 (9th Cir. 2014) (upholding a similar ban, again on the rationale that it regulates conduct, not speech)); *see also Wollschlaeger*, 848 F.3d at 1309. Nor can we forget that the Court specifically "stressed the danger of content-based regulations in the fields of medicine and public health." *NIFLA*, 138 S. Ct. at 2374 (quotation omitted).

The Supreme Court's warnings, like so much else from *NIFLA*, find no place in the dissent. Judge Rosenbaum proposes a brand-new category of speech regulation exempt from strict scrutiny—one that not only rejects our well-established aversion to viewpoint-based speech restrictions, but actually builds viewpoint

8                    GRANT, J., Concurring                    19-10604

into the analysis. The dissent suggests that we give special treatment to speech restrictions prohibiting "licensed professionals from practicing, on populations from whom informed consent cannot reliably be obtained, treatment techniques that (1) do not meet the prevailing standard of care, (2) are not shown to be efficacious, and (3) are associated with a significant increase in the risk of death"—in short, restrictions that apply only to what the dissent calls "Life-threatening Treatment Techniques." Rosenbaum Dissent at 46. This is not a category at all. It is a description of disfavored speech that bears no resemblance to the other analytical brackets set out by the Supreme Court. It privileges the current views of certain professional organizations. And it requires significant work to even decipher. As a "category," this misses the constitutional mark by a mile.

The innovation does not stop there. Although Judge Rosenbaum "concede[s]" that the talk therapy banned in this case is "speech, not conduct," one would not know it from the analysis that follows. Rosenbaum Dissent at 34. The dissent rejects the existing frameworks for evaluating laws that burden free speech, turning instead to caselaw relating to substantive due process and fundamental rights, concepts that are unrelated to this case and invoked by none of the parties. Using *Washington v. Glucksberg* to support a speech restriction is a novel approach. 521 U.S. 702 (1997). *Glucksberg*, after all, did not involve a First Amendment challenge; it outlined limits on substantive due process. *Id.* at 727–28. Yet the dissent insists that *Glucksberg* erects "three guardrails":

19-10604                    GRANT, J., Concurring                    9

it "focuses on the informed opinion of the healthcare community"; "suggests that the standard of care in question must be supported by research on the matter" (requiring, of course, that the research be "acceptable"); and "suggests that informed consent must be unable to mitigate the dangers of the Life-threatening Treatment Technique within the universe of clients on whom the law prohibits the practice of the Life-threatening Treatment Technique." Rosenbaum Dissent at 60, 62, 64. That is a remarkable set of takeaways from *Glucksberg*.

Equally remarkable, the dissent pivots to *Planned Parenthood v. Casey* in search of a fresh standard of review for its new category of speech. Rosenbaum Dissent at 67–71. In the dissent's view, the plurality opinion in *Casey* invites us to apply a "reasonableness" inquiry when testing the constitutionality of speech restrictions justified under the dissent's tripartite *Glucksburg* analysis. *See Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 883 (1992) (plurality opinion), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2242 (2022).

This approach is a house of cards. To start, *NIFLA* was clear that the *Casey* standard does not apply to regulations of "speech as speech." *NIFLA*, 138 S. Ct. at 2373–74. The rational basis "reasonableness" standard applies only to regulations of conduct that incidentally burden speech. *Id.* And as the dissent (at least ostensibly) concedes, that category does not fit the speech at issue here. Rosenbaum Dissent at 34. But despite that concession, the

dissent excises any traditional levels of scrutiny for speech restrictions; all that remains is judgment of "reasonableness." Is it even plausible that a judge who has already concluded that a particular kind of speech is a "Life-threatening Treatment Technique" will then conclude that it would be unreasonable to ban it? The question answers itself. If there is a standard better designed to allow speech that judges like and disallow speech that judges dislike, we do not know what it is.

Indeed, the dissent's "*Glucksburg* guideposts," apart from their creativity, are designed with one audience in mind. Who decides which professional bodies qualify as "leading" when considering the "informed opinion of the healthcare community"? Who defines the "jurisdiction" of those "leading professional bodies"? "Acceptable research" by whose standards? "Unable to mitigate the dangers" according to whom? The answer, of course, is judges. This category of speech and its circular test would replace all existing First Amendment doctrines with one question—whether a judge approves of the speech.

But whether speech is protected does not depend on whether judges, or communities, like it. The Constitution gives the government "no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation omitted). The government cannot be trusted to prohibit only *bad* speech. And our role as an independent judiciary is to enforce the First Amendment, not to decide which ideas are worthy of immunity

from government regulation—or which professional groups can make that decision for us.

Truthfully, the dissent's unfailing trust in professional groups is surprising given their track records on the very subject at issue. Well-intentioned professional associations "may hit the right mark—but they may also miss it." *Otto*, 981 F.3d at 869. As the panel opinion points out, only a few decades ago the exact set of "leading professional bodies" that the dissent trusts to regulate speech—and the research they relied on—endorsed treating homosexuality as a mental disorder. *See id.* at 869–70; American Psychiatric Association, DSM-I (1952); DSM-II (1968); DSM-II 6th printing change (1973); DSM-III (1980). Under the dissent's proposed test, this Court would have been required to uphold government bans on talk therapy that encouraged ideas about gender identity and sexual orientation that fell outside the social orthodoxy of that era. But that defies the First Amendment's "fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *NIFLA*, 138 S. Ct. at 2371 (quotations omitted). This country's guarantee of free expression has fostered many political, social, and religious debates, with our citizens encouraging one another to consider and reconsider the consensus position. It has never been the judiciary's role to moderate those debates, and we should not start now.

Even less convincing is the claim made by today's dissenters that our decision in *Wollschlaeger* has no bearing on this case. *See*

12                    GRANT, J., Concurring                    19-10604

Rosenbaum Dissent at 41–45; Jordan Dissent at 10–11.   Judge Jordan argues that a different procedural posture and a lack of disputed facts render *Wollschlaeger* so inapplicable that it can provide "no support" for the panel's decision in *Otto*.   Jordan Dissent at 11.   And Judge Rosenbaum simply draws lines between the substantive content prohibited in *Wollschlaeger* and those prohibited here, concluding that our earlier decision "does not in any way conflict with" her proposed approach because the statute there "could be understood to require" doctors to "*violate* the standard of care" rather than follow it.   Rosenbaum Dissent at 43, 45.

These attempts to distinguish our most relevant recent precedent are not persuasive.   *Wollschlaeger* explicitly held that "content-based restrictions on speech by those engaged in a certain profession" deserve heightened review.   848 F.3d at 1311 (rejecting both a comparison to *Casey* and application of rational basis review).   Indeed, it expressed "serious doubts" about the Ninth Circuit's characterization of the same kind of therapy as conduct rather than speech.   *Id.* at 1309.   And it emphasized that "the enterprise of labeling certain verbal or written communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation."   *Id.* at 1308 (quotation omitted).   It is no wonder that the district court found itself "stymied by the Eleventh Circuit's analysis in *Wollschlaeger*" when it considered the possibility that it could uphold the ordinances as regulating some form of conduct.   *Wollschlaeger* squarely precludes that argument.

It also precludes pulling a lax conduct-based standard of review out of *Casey* to perform an end-run on free speech doctrine in the professional context: "state officials cannot successfully rely on a single paragraph in the plurality opinion of three Justices . . . to support the use of rational basis review here." *Id.* at 1311. The dissenting opinion's attempt to convert a case striking down a speech ban for doctors into a case supporting a speech ban for therapists is spirited, but it fails to get the job done.

One final point. States need not shutter their licensing boards in light of this Court's decision in *Otto*. Regulatory authority is alive and well—just as robust as it was before the opinion. Indeed, though *Otto* was published nearly two years ago, we have no indication that therapy has become "a Wild West of anything goes—no matter how detrimental to clients' health." Rosenbaum Dissent at 25. Nor was there any such result in the years following our decision in *Wollschlaeger*, which also refused to allow content-based restrictions on professional speech. And that's no surprise, because "[t]his case, like *Wollschlaeger*, is not about licensure requirements. It is about speech." *Otto*, 981 F.3d at 866–67 (footnote and citation omitted). The State did not lose its ability to regulate the medical profession simply because it was compelled to respect constitutional boundaries. Nor, we add, have the parties raised the specter of thwarted health and safety

regulation so vividly imagined by Judge Rosenbaum. That concern is of the dissent's own making.[1]

We take some comfort in the fact that *NIFLA*'s dissenters also lobbed charges that the majority there imperiled health and safety regulations. *See NIFLA*, 138 S. Ct. at 2380–81 (Breyer, J., dissenting); *id.* at 2376 (majority opinion) (responding). And we are confident that the fears of regulatory impotence expressed here will be similarly relieved in good time. The panel opinion itself explains that states *can* penalize harmful speech and hold accountable those who hurt children. *Otto*, 981 F.3d at 870. License revocations, professional suspensions, malpractice suits, even criminal charges—all are on the table for professionals who violate the public trust. But "broad prophylactic rules in the area of free expression" remain suspect, no matter how much a judge may wish to engineer an exception for speech that seems particularly risky. *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)) (brackets omitted).

---

[1] We add that the panel opinion does not directly affect Florida's regulatory authority at all. The ordinances here are the legislative products of *local* governments, but Florida law commits regulatory authority to the State. *See* Fla. Stat. ch. 491 (regulatory authority over therapists); *id.* ch. 456 (regulatory authority over health professionals); *see also Vazzo v. City of Tampa*, 415 F. Supp. 3d 1087, 1107 (M.D. Fla. 2019).

19-10604                    GRANT, J., Concurring                    15

*    *    *

Neither the panel opinion nor this Circuit's decision against en banc review express any view on the efficacy or desirability of the speech at issue in this case.  Nor do they condone or ignore the struggles faced by many LGBTQ youth.  But "we cannot react to that pain by punishing the speaker.  As a Nation we have chosen a different course." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011).  What this Circuit has done—indeed, *all* it has done—is uphold the protections of the First Amendment for unpopular speech.  That can be hard to do.  But if the First Amendment only protected speech that judges and politicians approved of, it would not be of much use.  We concur in the Court's decision not to rehear this case en banc.

19-10604                JORDAN, J., Dissenting                1

JORDAN, Circuit Judge, joined by WILSON, Circuit Judge, and by ROSENBAUM and JILL PRYOR, Circuit Judges, as to Parts I-IV, dissenting from the denial of rehearing en banc:

Judge Rosenbaum makes a number of salient points in her dissent as to why, insofar as the First Amendment is concerned, SOCE therapy should be evaluated as a form of medical treatment. As the author of *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc), I think the characterization of SOCE therapy presents a difficult question. And although I am not sure who is right—Judge Rosenbaum or the panel majority—with respect to the First Amendment analysis, the issue is sufficiently important to merit en banc review.

I also believe en banc consideration is warranted for a less complex but no less important reason. As I hope to explain, the panel majority in this preliminary injunction appeal ignored the clear error standard of review—never acknowledging or applying it —and substituted its own factual findings for those of the district court on important issues.

I

When we hear an appeal from the denial or grant of a preliminary injunction, we review the district court's "factual findings for clear error." *Indep. Party of Fla. v. Sec'y*, 967 F.3d 1277, 1280 (11th Cir. 2020). That standard of review is so long-standing and unremarkable that it is by now gospel. Here is the way Judge Marcus put the matter some 20 years ago: "Preliminary injunctions are,

2                    Jordan, J., Dissenting                    19-10604

by their nature, products of an expedited process often based on an underdeveloped and incomplete evidentiary record. As is usually the case, the [district] court is in a far better position than this Court to evaluate the evidence, and we will not disturb its factual findings unless they are clearly erroneous." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1067, 1171 (11th Cir. 2002) (citations omitted).  It's hard to improve on that explanation.

The district court in this case took evidence from the parties and received proposed findings of fact and conclusions of law from them following oral argument.  Then, in its order denying a preliminary injunction, the district court evaluated the evidence and made a number of important factual determinations.  *See Otto v. City of Boca Raton*, 353 F. Supp. 3d 1237, 1241, 1258–70 (S.D. Fla. 2019) (*Otto I*).

The panel majority acknowledged the general abuse of discretion standard for preliminary injunction appeals, but it did not mention, much less apply, the subsidiary clear error standard for underlying factual findings.  *See Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020) (*Otto II*).  Indeed, the phrases "clear error" or "clearly erroneous" are nowhere to be found in the panel majority's opinion.

Maybe the panel majority thought that the clear error standard was inapplicable because the district court did not base its factual findings on credibility determinations.  But if that was the unstated reason for its failure to acknowledge and apply the clear error standard, the panel majority was mistaken.  "Findings of fact,

19-10604                JORDAN, J., Dissenting                3

whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). Not surprisingly, the Supreme Court has held that under Rule 52(a) the clear error standard applies not only to factual findings based on credibility determinations but also to findings based on "physical or documentary evidence or inferences from other facts." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

## II

A factual finding "is clearly erroneous when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (internal quotation marks and citation omitted). But a finding is not clearly erroneous simply because the reviewing court would have weighed the evidence differently or reached a different outcome. *See id.* at 574. If there are two permissible views of the evidence or the district court's account of the evidence is "plausible in light of the record viewed in its entirety," then the district court's finding is not clearly erroneous. *Id.* The clear error standard is therefore "highly deferential." *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019) (internal quotation marks and citation omitted).

Here the district court made several important findings of fact that the panel majority ignored, mischaracterized, or revised. In the interest of brevity, I will highlight two of the important findings by the district court and the findings that the panel majority substituted in their place.

## A

The district court found that there is a distinction between the plaintiffs' "expression of their views about SOCE, their advocacy of SOCE, . . . their discussions with minor clients about SOCE," and their "efforts, through a medical intervention, by a licensed provider, to therapeutically change a minor's sexual orientation." *Otto I*, 353 F. Supp. 3d at 1244, 1264, 1269. In other words, the district court found that the "practice" or "perform[ance]" of SOCE therapy is different from "a dialogue between patient and provider" about that treatment, even one in which a plaintiff "commend[ed] and recommend[ed]" it. *Id.* at 1256, 1269 (emphasis omitted).

The distinction is highlighted in the district court's factual determination that the speech in SOCE therapy is "both a treatment to be provided and an utterance to be said," i.e., that it "*is the manner of delivering* the treatment." *Id.* at 1254, 1256. The district court further found that SOCE therapy is "administered by a licensed medical professional, as part of 'the practice of medicine,'" and that the "[p]laintiffs are essentially writing a prescription for a treatment that will be carried out verbally." *Id.* at 1256. The district court found "the focus of the law on licensed providers significant" because "[a]s licensed providers, doctors are cloaked with the authority of science and the state [and t]hey are expected to be objective providers of care." *Id.* at 1269–70. *See also id.* at 1257–58 ("What is limited is the therapy (delivered through speech and/or

19-10604                JORDAN, J., Dissenting                5

conduct) by a licensed practitioner to his or her minor patient, within the confines of a therapeutic relationship.").

Contrary to the district court's findings, the panel majority found that SOCE therapy is "not medical at all" (although it purported to temper that pronouncement by saying that it "would not make a difference" if SOCE therapy was medical). *See Otto II*, 981 F.3d at 866 n.3. The panel majority characterized the practice of speech-based SOCE therapy as merely "advice that therapists may give their clients." *Id.* at 866. And it implied that SOCE therapy consists only of "conversations" which involve "ideas" and "viewpoints" that are "controversial," "unpopular," "disagreeable," and "offensive." *Id.* at 859, 861–64, 868–69, 872.

The panel majority erred in coming up with its own factual resolution of what SOCE therapy is. Whether a practice or course of treatment (oral or physical) is medical in nature is a factual determination, and the panel majority made no effort to explain why the district court's factual findings about SOCE therapy were clearly wrong. A "reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court," *Anderson*, 470 U.S. at 573, and that is what happened here.

This mistake, moreover, matters because it affects the nature of the governmental interest at stake. If SOCE therapy is medical in nature, as the district court found and as Judge Rosenbaum explains, then the government has a role in determining what is acceptable, even if the treatment consists merely of the spoken word. Psychiatrists, for example, often provide treatment to

patients in ways that involve only speech (sessions, questions, discussions, advice, goals, etc.).  That, however, does not mean that the psychiatrist's words must go unregulated absent a peer reviewed study with documented outcomes about each type of advice or counseling that can be provided.  No one would doubt that the government can forbid a psychiatrist from advising a patient with severe depression to take his or her own life immediately and put an end to the suffering.  And that content-based prohibition, it seems to me, would be sound under the First Amendment even if there was not a controlled study showing that most depressed patients given that advice followed it and committed suicide.  That is what the district court sensibly concluded here as to SOCE therapy.  *See Otto I*, 353 F. Supp. 3d at 1262 ("[T]he Defendants need not wait for a minor to publicly confess that the minor had agreed to try to change his or her sexual orientation through therapy only to experience self-hatred and suicidal ideation after the therapy failed.").

## B

The district court also found that the defendants had "extensive credible evidence" that SOCE therapy "is harmful or potentially harmful to all people, and especially to minors," and determined that the defendants had "legitimate, substantial, and compelling" interests in protecting minors from SOCE therapy.  *See Otto I*, 353 F. Supp. 3d at 1242, 1258, 1262.  In making these findings, the district court grappled with the nuances of the available evidence.  It discussed multiple pieces of documentary evidence,

including reports and statements from various medical professionals and major research and professional organizations. These sources included (a) the American Academy of Pediatrics, (b) the American Psychiatric Association, (c) the American Psychological Association, (d) the American Psychological Association Council of Representatives, (e) the Pan American Health Organization (an office of the World Health Organization), (f) the American Psychoanalytic Association, (g) the American Academy of Child and Adolescent Psychiatry, (h) the American School Counselor Association, and (i) the U.S. Department of Health and Human Services. *See id.* at 1258–62. The district court found that the evidence was persuasive and "far from anecdotal remarks that constitute mere conjecture." *Id.* at 1262. It understood that the "findings and views" in the literature "differ[ed] as to degree," but it ultimately found that they "present[ed] a consistent position that [SOCE] is harmful or potentially harmful." *Id.*

In addition, the district court considered the testimony provided to the local commissioners before the enactment of the challenged ordinances. It noted that mental health professionals had "spoke[n] out against conversion therapy," that a psychologist/sex therapist had advised that SOCE therapy can result in a number of health issues for minors, and that the leader of a local human rights group reported receiving complaints about minors who were being subjected to SOCE therapy. *See id.* at 1261.

Finally, the district court addressed the plaintiffs' contention that the evidence presented in support of the ordinances amounted

to "no evidence at all." *Id.* at 1262.  It thoughtfully considered the plaintiffs' argument that "rigorous research on the safety . . . of [SOCE] is deficient," as well as the reasons explained in the available evidence for why there wasn't more research. *Id.* at 1260.  After considering and weighing the evidence presented, the district court found that the "substantial evidence and consensus in the medical community" was sufficient and that the defendants could find that it was "overwhelming." *Id.* at 1260–63. *See also id.* at 1260 ("The sources cited in the ordinances all conclude that rigorous research on the safety and effectiveness of seeking to change sexual orientation is deficient, but that there already is substantial evidence and consensus in the medical community that conversion therapy can cause harm, including depression, self-harm, self-hatred, suicidal ideation, and substance abuse.") (footnote omitted).

Despite the district court's factual findings, the panel majority here came up with its own view of the evidence, much of which conflicted with the district court's assessment.  And in doing so it didn't once mention the clear error standard of review.

For example, in direct contradiction of the district court's finding that there was overwhelming persuasive evidence as to the harmful (or potentially harmful) effects of SOCE therapy, the panel majority incorrectly stated that the district court found that "evidence [was] not necessary when the relevant professional organizations are united." *Otto II*, 981 F.3d at 869.  Not only is that a mischaracterization of the district court's analysis, but it is also tantamount to saying that the consensus (i.e., agreement) of several

19-10604                 JORDAN, J., Dissenting                    9

professional organizations on the propriety of a treatment cannot constitute probative evidence.

The panel majority also found, again contrary to the district court's determination, that the defendants offered "assertions rather than evidence." *Id.* at 868. The panel majority focused almost exclusively on the American Psychological Association's 2009 task force report, saying that it made sense to do so because the report reviewed other literature and "[m]any of the other reports" relied on it. *See id.* at 868–69 & 869 n.8. The panel majority then placed more emphasis than the district court did on the "mixed views" in the report, the purported lack of rigorous research, and the task force's statement that the studies provide "no clear indication of the prevalence of harmful outcomes." *Id.* The panel majority found that the evidence in support of the challenged ordinances "is in serious tension with th[e] acknowledgement of the *lack* of rigorous research on nonaversive SOCE." *Id.* at 868 n.7. And it "fail[ed] to see how, even completely crediting the report," there was enough evidence. *See id.* at 869.

But this was the panel majority acting as the initial fact-finder and reweighing the evidence. The district court quoted the task force's conclusion at length, which included its "no clear indication" statement. *See Otto I,* 353 F. Supp. 3d at 1259. The district court, however, also quoted and considered the task force's next statement—that although the task force couldn't conclude how likely it was that harm would occur, studies indicated that SOCE therapy "may cause or exacerbate distress and poor mental health

in some individuals, including depression and suicidal thoughts." *Id.* The district court also noted that the American Psychological Association Council of Representatives "adopted a policy statement against SOCE." *Id.* And, to repeat what has already been said, the district court considered evidentiary sources in addition to the task force's report, including testimony and submissions provided to the local commissioners.

Even if the panel majority thought that its view of the evidence was preferable to that of the district court, that belief was insufficient to overcome the clear error standard. "A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 137 S. Ct. 1455, 1465 (2017).

### III

Faced with these problems, the panel majority provides two responses in its concurrence to the denial of rehearing en banc. First, it says that in applying *de novo* review to the district court's factual findings it acted just like the en banc court did in *Wollschlaeger,* and finds it "puzzl[ing]" that I—the author of *Wollschlaeger*—could think otherwise. Second, the panel majority contends that I have ignored cases holding that in First Amendment cases review of the facts is plenary. Neither response is convincing.

Let's begin with *Wollschlaeger.* It is true that we applied a *de novo* standard of review in that case, *see Wollschlaeger*, 848 F.3d at 1301, but that does not take away from my criticism of the

19-10604                JORDAN, J., Dissenting                11

panel majority's appellate fact-finding here.  For starters, *Woll-schlaeger* was a summary judgment appeal, and the review in such a case—unlike a preliminary injunction appeal—is plenary.  *See, e.g., Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 465 n.10 (1992); *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.4 (11th Cir. 2019) (en banc).  More importantly, there were no disputed issues of fact in *Wollschlaeger*, as the parties filed cross-motions for summary judgment and agreed on the facts.  The district court order we reviewed on appeal makes that abundantly clear.  *See Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1257 (S.D. Fla. 2012) ("The parties do not dispute the facts in this case; the sole issue before me is an issue of law. . . .  I will therefore proceed to resolve this case on its merits through summary judgment.").[1]

In sum, there was no appellate fact-finding on disputed issues in our en banc *Wollschlaeger* opinion.  That case therefore provides no support for the panel majority acting as the trier of fact here.

The panel majority also defends its opinion and approach by pivoting to cases holding that, in certain First Amendment scenarios, the clearly erroneous standard does not govern.  *See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S.

---

[1] If there were any doubt on this point, our en banc opinion in *Wollschlaeger* recited the relevant facts by citing to and quoting from the parties' joint statement of undisputed facts.  *See Wollschlaeger*, 848 F.3d at 1301-02.

557, 567 (1995) (explaining that appellate courts must decide "whether a given course of conduct falls on the near or far side of the line of constitutional protection"). I do not dispute that certain First Amendment questions—e.g., whether a statement receives First Amendment protection, whether a jury verdict is consistent with the First Amendment—are legal and require plenary review. *See, e.g., Peel v. Atty. Registration and Disciplinary Comm'n of Illinois*, 496 U.S. 91, 108 (1990) ("Whether the inherent character of a statement places it beyond the protection of the First Amendment is a question of law over which Members of this Court should exercise *de novo* review."); *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989) ("[W]hether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law."). What I do take issue with is the suggestion that the clear error standard vanishes altogether when First Amendment cases are reviewed on appeal.

We have explained, in a First Amendment appeal involving the denial of a preliminary injunction, that findings on "ordinary historical facts"—those which concern "the who, what, where, and how of the controversy"—receive traditional clear error review. *See Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (brackets omitted and capitalization deleted). It is only the "why" facts—the "motive" facts—that constitute "core constitutional facts" triggering *de novo* review. *See id.* at 1230 ("We must find the disputed 'why' facts—the motive facts—ourselves, as though the district court had never made any findings about them.") (citation

19-10604                 JORDAN, J., Dissenting                 13

omitted).  *See also Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (same); Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 235–36 (1985) ("Fact identification . . . is a case-specific inquiry into what happened here.  It is designed to yield only assertions that can be made without significantly implicating the governing legal principles.  Such assertions, for example, generally respond to inquiries about who, when, what, and where— inquiries that can be made 'by a person who is ignorant of the applicable law.' . . . . [W]hile 'what happened' may be viewed as a question of fact, the legal sufficiency of the evidence may be viewed as the equivalent of a question of law.") (footnotes omitted).

*Bloedorn* relied on *ACLU of Florida, Inc. v. Miami-Dade County*, 557 F.3d 1177, 1206–07 (11th Cir. 2009), the very case cited by the panel majority in its concurrence.  But the concurrence does not tackle the nuanced distinctions that *Bloedorn* and *ACLU* call for.[2]

Determining the nature of SOCE therapy requires answers to a number of questions.  Is SOCE therapy just talk?  Is SOCE therapy medical treatment rendered by licensed professionals?  Is SOCE therapy a combination of the two?  These are quintessential

---

[2] Again, the panel majority did not apply clear error review to *any* findings of fact.  So it apparently believed (though it did not explain) that *all* of the facts were constitutional core facts.  As explained by cases like *Bloedorn*, that broad-brush approach is not appropriate.

14                    JORDAN, J., Dissenting                    19-10604

"what" or "how" questions.  The inquiry, which seeks to determine what SOCE therapy is and how it is performed on the ground, is inherently factual.

As described earlier, the district court found that SOCE therapy is medical treatment or advice delivered orally by a licensed professional.  *See Otto I*, 353 F. Supp. 3d at 1254, 1256-58.  The panel majority should have applied the clear error standard to this finding, and should not have engaged in *de novo* review to find that SOCE therapy is "not medical at all."  *Otto II*, 981 F.3d at 866 n.3.

That leaves the evaluation of the evidence relied on by the defendants in enacting the ordinances. The district court found that the defendants had "extensive credible evidence" that SOCE therapy "is harmful or potentially harmful to all people, and especially to minors," and determined that the defendants had "legitimate, substantial, and compelling" interests in protecting minors from SOCE therapy.  *See Otto I*, 353 F. Supp. 3d at 1242, 1258, 1262.  The panel majority made a contrary finding, choosing to view and weigh the evidence in a different way.  *See Otto II*, 981 F.3d at 868-69.

It is one thing to say that the evidence presented to the defendants did not support the ordinances in question—that would be a core constitutional question.  *See, e.g., Keeton v. Anderson-Wiley*, 664 F.3d 865, 872 (11th Cir. 2011) ("We conclude that the evidence in this record does not support Keeton's claim that ASU's officials imposed the remediation plan because of her views on homosexuality.").  It is quite another, I submit, to use plenary review

to take all of the evidence head on, resolve disputes about what it demonstrated, make choices among conflicting inferences, and engage in a qualitative weighing analysis.  *See Prete v. Bradbury*, 438 F.3d 949, 960-61 (9th Cir. 2006) ("When the issue presented involves the First Amendment, . . . the standard of review is modified slightly.  Historical questions of fact (such as credibility determinations or ordinary weighing of conflicting evidence) are reviewed for clear error, while constitutional questions of fact (such as whether certain restrictions constitute a 'severe burden' on an individual's First Amendment rights) are reviewed *de novo*."); Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. at 236 n.37 ("Inferences drawn from such assertions [the who, when, what, and where] are also facts, so long as they rest on general experience.").

## IV

From my perspective, what the panel majority did here—ignoring and/or revising the district court's factual findings and failing to apply the clear error standard—is seemingly becoming habit in this circuit.  *See United States v. Brown*, 996 F.3d 1171, 1196–99, 1202–05 (11th Cir. 2021) (en banc) (Wilson, J., dissenting); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1066 (11th Cir. 2020) (en banc) (Jordan, J., dissenting); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1279 (11th Cir. 2020) (Wilson, J., dissenting).  If this trend continues, the bench and bar will be forgiven for thinking that a district court's factual findings are only inconvenient speed bumps on the road to reversal.

19-10604                ROSENBAUM, J., Dissenting                1

ROSENBAUM, Circuit Judge, joined by JILL PRYOR, Circuit Judge,
dissenting from the denial of rehearing en banc:

Mere "conversation" and "not medical at all." *See Otto v. City of Boca Raton*, 981 F.3d 854, 866, 866 n.3 (11th Cir. 2020). That's how the panel opinion characterizes talk therapy (psychotherapy) that is practiced by a licensed mental-healthcare professional who has attended years of school and clinical training, and that is administered in a private setting for the purpose of helping a client with a mental-health condition. In the Concurrence's view, there's no difference between this mental-healthcare treatment and "political, social, and religious debates." *See* Conc. at 11.

But of course, no one goes to a doctor or therapist to engage in a "political, social, [or] religious debate[]"; they go to obtain treatment of their health condition.[1] By incorrectly labeling talk-therapy mental-healthcare treatments as mere "conversation" and "not medical at all," the panel opinion necessarily subjects to First Amendment strict scrutiny *all* government regulations that require licensed mental-healthcare professionals to comply with the governing substantive standard of care in administering talk therapy. And that scrutiny rings the death knell for any such regulation.

---

[1] I use the term "health condition" in this context to refer to the distress some individuals who are gay or transgender experience, often because of some others' treatment of gay and transgender individuals. *See generally supra* at notes 3–5.

2                    ROSENBAUM, J., Dissenting                19-10604

Indeed, under our Circuit's uninformed take on talk therapy as set forth in the panel opinion, no state or local government can require licensed mental-healthcare professionals to comply with any substantive standard of care at all in administering talk therapy. And no state or local government can even discipline licensed mental-healthcare professionals who violate the standard of care in administering talk therapy—no matter how incompetent or dangerous a practitioner's practice of psychotherapy may be.

That cannot be right. For that reason alone, this case demands en banc review.

But that's not the only reason. Because the panel opinion effectively precludes all regulation of substantive talk therapy, it necessarily ensures that the government cannot regulate types of talk therapy that significantly increase the risk of suicide and have never been shown to be efficacious.

That includes the practice this case is about—sexual-orientation change efforts[2] ("SOCE"), which is associated with *more than*

---

[2] SOCE refers generally to attempts to change an individual's sexual orientation or gender identity. In using the term "SOCE," I echo the panel opinion's caution: "We are mindful that the terminology itself is contested. Plaintiffs reject the often-used label 'conversion therapy,' which they associate with 'shock treatments, involuntary camps, and other chimerical or long-abandoned practices.' We will proceed with the broad (if imperfect) term 'sexual orientation change efforts.' This term is used in both [the City and County] ordinances [at issue], and all parties seem to accept it." *Otto v. City of Boca Raton*, 981 F.3d 854, 859 n.1 (2020).

19-10604              ROSENBAUM, J., Dissenting                3

*doubling* suicide attempts in the many LGBTQ youths who have been subjected to it.[3]  Take a moment to think about that profound human toll[4]—on those subjected to SOCE, those who care about

---

[3] *See* The Trevor Project, *National Survey on LGBTQ Youth Mental Health* ("Trevor Project Survey") *2021*, at 12, https://www.thetrevorpro-ject.org/wp-content/uploads/2021/05/The-Trevor-Project-National-Sur-vey-Results-2021.pdf; *see also* 2020 Trevor Project Survey, at 5, https://www.thetrevorproject.org/wp-content/uploads/2020/07/The-Tre-vor-Project-National-Survey-Results-2020.pdf; 2019 Trevor Project Survey, at 1, 3, https://www.thetrevorproject.org/wp-content/uploads/2019/06/The-Trevor-Project-National-Survey-Results-2019.pdf; Q Christian Fellowship, *The Good Fruit Project:  A Christian Case Against LGBTQ Change Efforts*, at 6, https://static1.squarespace.com/static/5faeade71e53e609dae94549/t/61816f9e8035324436737c7b/1635872672829/The+Good+Fruit+Pro-ject+Guide+%7C+Q+Christian+Fellowship+%26+The+Trevor+Pro-ject.pdf; The Williams Institute on Sexual Orientation and Gender Identity Law, UCLA School of Law, *Conversion Therapy and LGBT Youth* (Jun. 2019), https://williamsinstitute.law.ucla.edu/publications/conversion-therapy-and-lgbt-youth/ ("Efforts to change someone's sexual orientation or gender identity are associated with poor mental health for LGBT people").

[4] As of September 2020, about 1,994,000 minors between the ages of 13 and 17 in the United States were estimated to be LGBT.  *See* The Williams Institute on Sexual Orientation and Gender Identity Law, UCLA School of Law (Kerith J. Conron), *LGBT Youth Population in the United States* (Sept. 2020), https://williamsinstitute.law.ucla.edu/publications/lgbt-youth-pop-us/. Considering that 12% of LGBTQ youth in this age range have reported being subjected to SOCE, *see* 2021 Trevor Project Survey at 12, that suggests that 239,280 youths will be more than twice as likely to try to kill themselves.  And tragically, many will succeed.

4                    Rosenbaum, J., Dissenting                    19-10604

them, and the world, which forever loses out on their talents and contributions.

Given this sobering fact, perhaps it is unsurprising that every leading medical and mental-health organization within whose jurisdiction the practice of SOCE falls and that has commented on it has uniformly denounced it.  *See*, *e.g.*, American Medical Association, *Issue brief: LGBTQ change efforts (so-called "conversion therapy")*, https://www.ama-assn.org/system/files/2019-12/conversion-therapy-issue-brief.pdf ("All leading professional medical and mental health associations reject 'conversion therapy' as a legitimate medical treatment.  In addition to the clinical risks associated with the practice, the means through which providers or counselors administer change efforts violate many important ethical principles, the foremost of which: 'First, do no harm.'").[5]  Not

---

[5] *See also, e.g.*, American Psychiatric Association, *APA Reiterates Strong Opposition to Conversion Therapy* (Nov. 15, 2018), https://web.archive.org/web/20181123042000/https://www.psychiatry.org/newsroom/news-releases/apa-reiterates-strong-opposition-to-conversion-therapy (stating that "efforts to [change same-sex orientation] represent a significant risk of harm by subjecting individuals to forms of treatment which have not been scientifically validated and by undermining self-esteem when sexual orientation fails to change"); American Academy of Child and Adolescent Psychiatry, *Conversion Therapy* (2018), https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx#:~:text=The%20AACAP%20Policy%20on%20%E2%80%9CConversion%20Therapies%E2%80%9D%20The%20American,orientation%2C%20gender%20identity%2C%20and%2For%20gender%20expression%20is%20pathological (concluding that, "based on the scientific evidence, . . . 'conversion therapies' . . . lack scientific credibility and clinical utility[,] . . . [and] there

19-10604          ROSENBAUM, J., Dissenting                    5

is evidence that such interventions are harmful[,] . . . [so they] should not be part of any behavioral treatment of children and adolescents"); American Psychological Association, *Sexual Orientation and Homosexuality*, https://www.apa.org/topics/lgbt/orientation ("All major national mental health organizations have officially expressed concerns about therapies promoted to modify sexual orientation. To date, there has been no scientifically adequate research to show that therapy aimed at changing sexual orientation . . . is safe or effective."); World Health Organization, *"Therapies" to change sexual orientation lack medical justification and threaten health* (May 17, 2012), https://www.paho.org/hq/index.php?option=com_content&view=article&id=6803:2012-therapies-change-sexual-orientation-lack-medical-justification-threaten-health&Itemid=1926&lang=en (stating that SOCE is "against fundamental principles of psychoanalytic treatment and often result[s] in substantial psychological pain by reinforcing damaging internalized attitudes"); American Academy of Pediatrics, *Homosexuality and Adolescence* (Oct. 1, 1993), https://pediatrics.aappublications.org/content/pediatrics/92/4/631.full.pdf, and *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents* (Oct. 1, 2018), https://pediatrics.aappublications.org/content/142/4/e20182162 ("Reparative approaches have been proven to be not only unsuccessful[] but also deleterious . . . "); American College of Physicians, *Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper From the American College of Physicians* (Jul. 21, 2015), https://www.acpjournals.org/doi/10.7326/M14-2482?articleid=2292051& ("All major medical and mental health organizations . . . denounce the practice of reparative therapy for treatment of LGBT persons. . . . Available research does not support the use of reparative therapy as an effective method in the treatment of LGBT persons. Evidence shows that the practice may actually cause emotional or physical harm to LGBT individuals, particularly adolescents or young persons."); American College of Physicians, Society for Adolescent Health & Medicine, *Recommendations for Promoting the Health and Well-Being of Lesbian, Gay, Bisexual, and Transgender Adolescents: A Position Paper of the Society for Adolescent Health and Medicine*, https://www.jahonline.org/article/S1054-139X(13)00057-8/fulltext ("Reparative 'therapy,' which attempts

6                    ROSENBAUM, J., Dissenting                    19-10604

to change one's sexual orientation or gender identity, is inherently coercive and inconsistent with current standards of medical care."); American Mental Health Counselors Association, *AMHCA Statement on Reparative or Conversion Therapy*, https://www.amhca.org/viewdocument/amhca-statement-on-reparative-or-co?LibraryFolderKey=&DefaultView=folder (expressing concern that "reparative therapy has been documented to . . . increas[e] internalized stigma and potentially result[] in numerous negative side effects"); National Association of School Psychologists, *Key Messages and Talking Points for School Psychologists* (2019), https://www.nasponline.org/x53289.xml (stating that "[c]onversion . . . therapy is an unscientific, unproven and unethical practice that harms LGBTQ+ youth" and "has been shown to worsen internalized homophobia, interrupt healthy identity development, increase depression, anxiety, self-hatred, and self-destructive behaviors, and create mistrust of mental health professionals," and [t]here is no valid or methodologically sound research that demonstrates sexual orientation change efforts are effective or beneficial to the person"); American Association of Family Physicians, *Reparative or Conversion Therapy*, https://www.aafp.org/about/policies/all/reparative-therapy.html ("The American Academy of Family Physicians (AAFP) opposes the use of 'reparative' or 'conversion therapy for sexual and gender minority individuals of all ages. The AAFP recommends that patients and their families seek services that provide accurate information on sexual orientation and sexuality, gender identity, and increase social support, and reduce stigma and rejection of sexual and gender minority persons."); National Association of Social Workers, National Committee on Lesbian, Gay, Bisexual, and Transgender Issues, *Sexual Orientation Change Efforts (SOCE) and Conversion Therapy with Lesbians, Gay Men, Bisexuals, and Transgender Persons* (May 2015), https://www.socialworkers.org/LinkClick.aspx?fileticket=yH3UsGQQmYI%3D ("The NASW National Committee on Lesbian, Gay, Bisexual, and Transgender Issues believes that SOCE can negatively affect one's mental health and cannot and will not change sexual orientation or gender identity."); American Counseling Association, *Conversion Therapy Bans*, https://www.counseling.org/government-affairs/state-issues/conversion-therapy-bans ("The American Counseling Association opposes conversion therapy because it does not work, can cause

19-10604          ROSENBAUM, J., Dissenting                    7

only is SOCE associated with great harm to LGBTQ youth, but SOCE does not even "meet the criteria to be deemed efficacious or well-established." Amy Przeworski, et al., *A Systematic Review of the Efficacy, Harmful Effects, and Ethical Issues Related to Sexual Orientation Change Efforts*, Vol 28, No. 1, Clinical Psychology: Science and Practice 94 (Am. Psychological Ass'n 2021).

Yet after the panel opinion here, in the states of Florida, Georgia, and Alabama, state and local governments cannot preclude their licensed mental-healthcare providers from performing any type of talk therapy—including SOCE talk therapy—on minors, even if it is associated with significantly increasing their risk of death and even if the "therapy" is not shown to work.[6]

---

harm, and violates our Code of Ethics."); American Academy of Nursing, *American Academy of Nursing Opposes Reparative Therapy and Employment Discrimination Against LGBT Individuals* (Jun. 17, 2015), https://www.prweb.com/releases/2015/06/prweb12793416.htm (stating that there is "strong scientific evidence concluding that techniques used in reparative therapies are ineffective by failing to achieve intended results and imparting inherently harmful effects on mental and physical health on individuals being pressured to change").

[6] Judges Grant and Lagoa's Concurrence contends that "the panel opinion does not directly affect Florida's regulatory authority at all" because "[t]he ordinances here are the legislative products of *local* governments, but Florida law commits regulatory authority to the State." Conc. at 14 n.1. But that distinction is irrelevant because the panel opinion equally precludes both state and local governments from regulating the substantive practice of talk therapy by licensed mental-healthcare professionals. That is so because substantive regulations of talk therapy are necessarily content-based, so the panel opinion's (and the Concurrence's) misunderstanding of talk therapy as "not

8                    ROSENBAUM, J., Dissenting                    19-10604

Because the panel opinion incorrectly—and to grievous ef-
fect—precludes government substantive regulation of talk therapy
its licensed professionals perform, I respectfully dissent from the
denial of rehearing en banc.

There's a better answer. And contrary to the Concurrence's
mischaracterization of my dissent, *see* Conc. at 7, it doesn't involve
targeting speech because we're not fond of the viewpoint it ex-
presses.

Rather, under the police power to regulate the public health
and safety, the government can preclude the mental-healthcare

---

medical at all" and mere "conversation" means that such regulations—
whether enacted by the state or local government—equally violate the First
Amendment because they equally discipline on the basis that the content of
the talk therapy fails to conform to the substantive standard of care.

To the extent that footnote 1 in the Concurrence now tries to suggest
a new basis for the panel opinion's ruling—preemption—the panel opinion
had the chance to address that argument but expressly chose not to do so. *See
Otto*, 981 F.3d at 871 (explaining that the panel opinion was not deciding the
preemption issue). Interestingly, it declined to rule on preemption despite the
Concurrence's apparent belief that resolving that issue would have ended the
case, and "[g]enerally, we don't answer constitutional questions that don't
need to be answered." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1348
(11th Cir. 2021). Now that the panel opinion has gone ahead and answered
the constitutional question (while taking a pass on the preemption issue) and
we are bound by its holdings, I respectfully disagree that raising the preemp-
tion issue at this point somehow excuses the Concurrence from acknowledg-
ing the reality that the panel opinion directly precludes states from regulating
the substantive practice of talk therapy by licensed mental-healthcare profes-
sionals.

19-10604          Rosenbaum, J., Dissenting              9

professionals it licenses from practicing talk therapy that is life-threatening and inefficacious—whatever its content—on children who aren't able to say no. As I show, a long tradition of states' permissible regulations requiring licensed healthcare professionals to comply with the governing substantive standard of care—for health (not speech) reasons—establishes that.

One final note before I show why this is necessarily so: the Concurrence criticizes some of the ideas expressed in this dissent. And that's only fair. After all, I criticize the ideas set forth in the panel opinion and the Concurrence because I think they are incorrect. But the Concurrence also mischaracterizes my arguments in important ways. Attacks on phantom arguments are, of course, easier to make, but they're also irrelevant. So along the way, I point out these mischaracterizations and ask the reader to watch for them. With that, let's begin.

I.    The First Amendment generally allows states to discipline licensed mental-healthcare providers who fail to comply with the substantive standard of care in engaging in talk therapy.

In this section, I show that the First Amendment generally allows states to discipline licensed mental-healthcare providers who fail to comply with the substantive standard of care when they administer talk therapy. I divide Section I into three subsections. Section A briefly explains the First Amendment framework relevant here. Section B describes how government regulation has long required licensed healthcare professionals—including licensed

10                ROSENBAUM, J., Dissenting                19-10604

mental-healthcare professionals—to comply with the substantive standard of care.  And Section C explains that, given that fact, regulations that require licensed mental-healthcare professionals to comply with the substantive standard of care that generally governs talk therapy are permissible content-based restrictions on speech.

A.    The Supreme Court has recognized that, under the First Amendment, governments constitutionally may impose content-based restrictions on speech when persuasive evidence of a long tradition to that effect exists and the restrictions survive appropriate scrutiny.

I begin with the controlling Supreme Court precedent:  *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*").  *NIFLA* addressed the constitutionality of two notices that California required certain pregnancy clinics to post.  *See id.*  One notice contained information about free pregnancy-related care, including abortion services, available at places other than the clinics that were required to post the notice.  *Id.* at 2368–69.  The other notice informed potential patrons that the healthcare providers at the facility where the notice was posted were not licensed, and it offered information on how to obtain healthcare services from licensed providers.  *Id.* at 2369–70.

The Ninth Circuit affirmed the district court's denial of a preliminary injunction enjoining the California law, concluding that both notices survived "the 'lower level of scrutiny' that applies to regulations of 'professional speech.'"  *Id.* at 2370.  In reversing,

19-10604          Rosenbaum, J., Dissenting          11

the Supreme Court stated that it "has not recognized 'professional speech' as a separate category of speech[,]" and "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Id.* at 2371–72.

But the Court acknowledged that "a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles[] . . . [may] exist[]." *Id.* at 2375. And it expressly recognized that although content-based regulations are presumptively unconstitutional, Supreme Court jurisprudence "permit[s] governments to impose content-based restrictions on speech with[] '"persuasive evidence . . . of a long (if heretofore unrecognized) tradition'" to that effect."[7] *Id.* at 2372 (citations omitted) (bracketed alterations added; other alterations in original). Categories of speech that satisfy that exception are very rare, but they do exist.[8]

---

[7] Of course, *NIFLA* was not the first Supreme Court opinion to expressly identify this exception. *See, e.g., United States v. Stevens*, 559 U.S. 460, 472 (2010). But *NIFLA* is one of the most recent iterations of the exception, and the panel opinion relies substantially on it, so I focus on *NIFLA*.

[8] The complete sentence where the quotation appears states, "This Court's precedents do not permit governments to impose content-based restrictions on speech *without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect.*" *NIFLA*, 138 S. Ct. at 2372 (cleaned up) (emphasis added). The Concurrence implies that I have inaccurately represented *NIFLA* as recognizing an exception to the rule that governments generally cannot impose content-based restrictions on speech. *See* Conc. at 5–6. But a straightforward reading of the quotation (not to mention the opinion) shows that is not so. Indeed, if the Concurrence were correct, the quotation would end

12                    ROSENBAUM, J., Dissenting                    19-10604

In fact, *NIFLA* identified two subcategories of "professional speech" to which this exception applies and for which the Supreme Court has recognized that the government may issue content-based regulations: (1) laws that "require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" *NIFLA*, 138 S. Ct. at 2372 (citations omitted), and (2) "regulations of professional conduct that incidentally burden speech," *id.* at 2373. And, as I have noted, it left open the possibility that other subcategories of "professional speech" for which the

---

after the word "speech." But it doesn't. And the plain language of the phrase after the word "speech" sets forth an exception to the rule.

Similarly, the Concurrence also quotes the first half of a sentence in *United States v. Alvarez*, 567 U.S. 709, 722 (2012)—the opinion that *NIFLA* quotes—for the proposition that the Constitution bars "any freewheeling authority to declare new categories of speech outside the scope of the First Amendment." Conc. at 6–7 (quotation marks omitted). But the second half of that very same sentence in *Alvarez* observes that "the Court has acknowledged that perhaps there exist some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed . . . in our case law." *Alvarez*, 567 U.S. at 722 (quotation marks and citation omitted). And in the next sentence, *Alvarez* states, "Before exempting a category of speech from the normal prohibition on content-based restrictions, however, the Court must be presented with persuasive evidence that a novel restriction on content is part of *a long (if heretofore unrecognized) tradition* of proscription." *Id.* (quotation marks and citation omitted) (emphasis added). The Concurrence's refusal to acknowledge that *NIFLA* (and *Alvarez*) identify a very limited exception to the general content-based-regulations rule does not make the exception go away.

19-10604          ROSENBAUM, J., Dissenting          13

government may promulgate content-based regulations may exist. *See id.* at 2372.

**B.     There is a long tradition of government regulation requiring licensed professionals to adhere to the governing standard of care when administering healthcare treatments—including talk therapy.**

*1.     Talk therapy is a healthcare treatment technique.*

Talk therapy is also known as psychotherapy.[9]  The National Institute of Mental Health ("NIMH"), "the lead federal agency for research on mental disorders,"[10] describes "talk therapy" as "a term for a variety of *treatment techniques* that aim to help a person identify and change troubling emotions, thoughts, and behavior." *See* Nat'l Inst. of Mental Health, *Psychotherapies*, https://www.nimh.nih.gov/health/topics/psychotherapies (last visited July 15, 2022) (emphasis added); *see also Psychotherapy*, Online Etymology Dictionary, https://www.etymonline.com/word/psychotherapy (last visited July 15, 2022)

---

[9]  *See* Nat'l Inst. of Mental Health, *Psychotherapies*, https://www.nimh.nih.gov/health/topics/psychotherapies (last visited July 15, 2022); American Psychiatric Ass'n, *What is Psychotherapy?*, https://www.psychiatry.org/patients-families/psychotherapy (last visited July 15, 2022); Joseph Saling, *Guide to Psychiatry and Counseling*, https://www.webmd.com/mental-health/guide-to-psychiatry-and-counseling (last visited July 15, 2022).

[10] Nat'l Inst. of Mental Health, https://www.nimh.nih.gov/ (last visited July 15, 2022).

14                  Rosenbaum, J., Dissenting                  19-10604

(etymology of term "psychotherapy" ("psycho-" + "therapy")
stems from Greek words "psykhē" (meaning "the soul, mind, spirit
. . .") and "therapeuein" (meaning "to cure, *treat medically*") (em-
phasis added)).

        As a mental-healthcare "treatment technique," talk therapy
falls within the overarching category of healthcare treatment tech-
niques—just as drug therapy, physical therapy, and surgery do.
Like any other healthcare treatment technique, talk therapy is sci-
entifically based and occurs entirely between the healthcare profes-
sional and her client, and its sole purpose is to treat a health condi-
tion.[11]  Also as with any other healthcare treatment technique, to
learn to practice talk therapy competently, mental-healthcare pro-
fessionals must attend school and train clinically.  *See, e.g.*, Fla.
Stat. § 491.003(9) ("The term 'practice of mental health counseling'
means the use of *scientific* and *applied behavioral science* theories,
methods, and techniques for the purpose of describing, preventing,
and treating undesired behavior and enhancing mental health and
human development and is based on the person-in-situation per-
spectives *derived from research and theory* . . . .") (emphasis
added); Fla. Stat. § 491.003(7)(b) ("The use of specific methods,
techniques, or modalities within the practice of clinical social work

_____

[11] *See, e.g.*, American Psychological Association, *Understanding psychother-
apy and how it works* (last updated Mar. 16, 2022), https://www.apa.org/top-
ics/psychotherapy/understanding ("In psychotherapy, psychologists apply
scientifically validated procedures to help people develop healthier, more ef-
fective habits.").

19-10604          Rosenbaum, J., Dissenting          15

is restricted to clinical social workers *appropriately trained* in the use of such methods, techniques, or modalities.") (emphasis added); Fla. Stat. § 491.003(8)(b) ("The use of specific methods, techniques, or modalities within the practice of marriage and family therapy is restricted to marriage and family therapists *appropriately trained* in the use of such methods, techniques, or modalities.") (emphasis added); Fla. Stat. § 491.003(8) ("The 'practice of clinical social work' is defined as the use of *scientific* and applied knowledge, theories, and methods for the purpose of . . . treating individual . . . behavior . . . .  The practice of clinical social work includes, but is not limited to, psychotherapy . . . .") (emphasis added).

For these reasons, states have long required mental-healthcare professionals who wish to practice talk therapy to be licensed professionally—just as internists, physical therapists, and surgeons who desire to practice the treatment techniques they learn in school and perfect in training must be.

> 2.     *Governments have long required licensed professionals to comply with the governing standard of care when administering healthcare treatment techniques—including talk therapy.*

"[F]rom time immemorial," states have constitutionally exercised their police power to regulate the public health and safety, to enact standards for obtaining and maintaining a professional license. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).  Indeed, the

16                    ROSENBAUM, J., Dissenting                    19-10604

Supreme Court has "recognize[d] that the States have a *compelling interest* in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have *broad power* to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) (emphasis added). And it has singled out healthcare professionals in particular as appropriately subject to such regulation. In this respect, the Supreme Court has commented that, among professions, "[t]here is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. Maryland*, 218 U.S. 173, 176 (1910).

This, of course, applies equally to the mental-healthcare professions. More than a century ago, in *Crane v. Johnson*, 242 U.S. 339, 340, 344 (1917), the Supreme Court upheld California's licensing requirement for "drugless [healthcare] practitioner[s] [who] employ in practice faith, hope, and processes of mental suggestion and mental adaptation" as falling within "the general scope of the police power of the state." After all, "the word 'health[]' . . . includes psychological as well as physical well-being." *United States v. Vuitch*, 402 U.S. 62, 72 (1971); *see also Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 882 (1992) (O'Connor, J., separate portion of plurality opinion) ("It cannot be questioned that psychological well-being is a facet of health."), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, ___ S. Ct. ___, No. 19-1392, 2022 WL 2276808 (June 24, 2022). And a mental-

health condition can be just as life-threatening as a physical-health condition.

So Florida (and other states) enacted licensing and disciplinary statutes that mental-healthcare practitioners must comply with to practice in the state of Florida (and those other states, respectively). *See, e.g.*, Fla. Stat. §§ 491.0046(1)(b), 491.0046(1)(c), 491.005. Taking Florida as an example, the state went to this trouble because it concluded that "the practice of clinical social work, marriage and family therapy, and mental health counseling by persons not qualified to practice such professions presents a danger to public health, safety, and welfare." Fla. Stat. § 491.002.

No wonder. The difference between skilled and inept talk therapy—no less than that between deft and botched surgery—can, in some cases, mean the difference between life and death. Ensuring a competent quality of those who practice talk therapy in Florida, then, furthers Florida's legitimate (and "compelling," *Goldfarb*, 421 U.S. at 792) concern for the public health and safety of its citizens.

Towards this end, Florida's licensing scheme makes certain acts by licensed professionals who practice talk therapy subject to discipline and penalties, including revocation of their licenses. For example, those licensed in clinical social work, marriage and family therapy, mental-health counseling, and psychological services may not "[f]ail[] to meet the minimum standards of performance in professional activities when measured against generally prevailing peer performance." Fla. Stat. §§ 490.009(1)(r); 491.009(1)(r). In

18                ROSENBAUM, J., Dissenting                19-10604

other words, licensed professionals must comply with the standard of care in their mental-healthcare practices.

Historically, Florida has enforced these rules and others like them.[12]  So when it comes to talk therapy, under Fla. Stat. §§ 490.009(1)(r) and 491.009(1)(r), Florida has undertaken disciplinary actions against licensed practitioners whom the State concludes have failed to meet the substantive standard of care.  That is, the *content* of the talk therapy these licensed practitioners have administered to their clients has violated the standard of care.  And Florida has subjected them to disciplinary proceedings for the incompetent aspects of the content of their talk therapy.

For instance, Florida's Department of Health Discipline and Administration instituted an action against a licensed marriage and family therapist for violating "the standard of care for a marriage and family therapist assisting couples with domestic violence or abusive relationship issues" by, among other deficiencies, not focusing on anger management in the treatment administered.  Fla. Dep't of Health Discipline & Admin. Action No. 1999-60963.  The state could not have undertaken this disciplinary action without reviewing the content of the talk therapy administered and finding it deficient under the substantive standard of care.  And to avoid this

---

[12] Other states have long had similar rules.  *See, e.g.*, Ga. Code §§ 43-10A-2, 43-10A-6; Ala. Code §§ 22-56-3, 22-56-4(b)(16).  I focus on Florida for convenience, since Defendants-Appellees City of Boca Raton and Palm Beach County are located there.

sanction, the professional would have had to have included and "focus[ed]" on anger-management content in the talk therapy provided in this case.  In other words, though the state punished the therapist for his failure to comply with the substantive standard of care in administering talk therapy, the only way to determine that failure had occurred was to consider the content of his talk therapy.

Action No. 1999-60963 is not a one-off.  Florida's healthcare-provider professional discipline files contain more cases of this type where that one came from.  In Action No. 2020-05957,  the Department brought a complaint against a licensed clinical social worker that alleged he "failed to meet the minimum standards of performance in clinical social work when measured against generally prevailing peer performance," in violation of Fla. Stat. § 491.009(1)(r). Fla. Dep't of Health Discipline & Admin. Action No. 2020-05957. Specifically, the Department took issue with the professional's failure to "discuss [with the suicidal patient] the patient's reasons to live, hope for the patient's future, coping skills the patient can engage in, and identify individuals the patient can turn to or a crisis number they can call if needed."  Again, this action punished the professional for failing to comply with the substantive standard of care in administering talk therapy—an action that necessarily required consideration of the content of his talk therapy.

And in Action No. 2016-14260, the Department brought a complaint against a licensed social worker and marriage family therapist that alleged she "fail[ed] to meet the minimum standards of performance in professional activities when measured against

20                   ROSENBAUM, J., Dissenting                   19-10604

generally prevailing peer performance," in violation of Fla. Stat. §
491.009(1)(r).  Fla. Dep't of Health Discipline & Admin. Action No.
2016-14260.  Here, the Department disciplined the professional for
"utilizing incorporation therapy" in treatment and "failing to use a
therapy approach in her treatment . . . [that] involved or encour-
aged increased interaction" between her client and the client's fa-
ther.  Once again, this action punished the professional for failing
to comply with the substantive standard of care in administering
talk therapy—an action that necessarily required consideration of
the content of her talk therapy.

        The list continues.  *See, e.g.*, Dep't of Health Discipline &
Admin. Action No. 2006-00013 (Department brought a complaint
against a licensed mental-health counselor that alleged she "fail[ed]
to meet the minimum standards of performance in professional ac-
tivities when measured against generally prevailing peer perfor-
mance," in violation of Fla. Stat. § 491.009(1)(r), by, among other
things, "showing a lack of professionalism in [her] written commu-
nications to the [client]"); Fla. Dep't of Health Discipline & Admin.
Action No. 2008-08922 (Department brought a complaint against a
licensed psychologist that alleged she "fail[ed] to meet the mini-
mum standards of performance in professional activities when
measured against generally prevailing peer performance," in viola-
tion of Fla. Stat. § 490.009(1)(r), by, "[u]pon termination of services
by [the] patient [], failing to remind [the] patient [] that she could
find a replacement psychologist, therapist, or psychiatrist by con-
sulting her insurer's provider directory").  At the risk of being

19-10604          Rosenbaum, J., Dissenting          21

redundant and once again pointing out the obvious, the state punished these professionals for the content of their speech.

These types of disciplinary actions, when healthcare professionals have violated the governing standard of care, have long been a critical component of—indeed, inextricably intertwined with—the state's power to license professionals. Without the ability to ensure its licensees' continuing minimum standards of competency, a state's licensing system would be virtually worthless in protecting public health and safety. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("[T]he state bears a special responsibility for *maintaining* standards among members of the licensed professions.") (emphasis added); *Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 612 (1935) ("That the state may regulate the practice of dentistry, prescribing the qualifications that are reasonably necessary, and to that end may require licenses and establish supervision by an administrative board, is not open to dispute. The state may thus afford protection against ignorance, incapacity and imposition.") (citations omitted).

Imagine, for example, a licensed surgeon whose lack of proficiency in surgery causes patients regularly to bleed out and die. If a state did not retain the related ability to discipline its licensed professionals for the quality of care they delivered, it could not revoke that incompetent surgeon's license. Nor could it otherwise ban that surgeon from continuing to butcher unknowing patients who rely on the doctor's state licensure as an imprimatur of a certain level of competence. But of course, states can and do revoke

22                    Rosenbaum, J., Dissenting                19-10604

professional healthcare licenses for incompetence (among other reasons) as a permissible exercise of the police power to protect the public health and safety.

As the mental-healthcare-professional disciplinary actions I have discussed show, the same is true of the states' record of disciplining the incompetent mental-healthcare professional who practices talk therapy. If a state could not revoke the license of (or otherwise discipline) a professional whose inept talk therapy contributed in a significant way to, for example, clients' decisions to kill themselves, the state's police power to protect public health and safety would be effectively worthless in that context. *See Semler*, 294 U.S. at 612 (emphasizing the state's ability to engage in continuing oversight of dentists to protect against, among other things, "incapacity").

That the treatment technique of talk therapy is administered through words does not somehow render it any less of a healthcare treatment technique or any less subject to government regulation in the interest of protecting the public health. *See Crane*, 242 U.S. at 344; *Vuitch*, 402 U.S. at 72 (explaining that "the word 'health[]' . . . includes psychological as well as physical well-being."). Talk therapy can be just as lifesaving or deadly as surgery, depending on who administers it and how.

So practitioners of talk therapy have not historically been exempt from complying with the governing standard of care simply because they administer their healthcare treatment with words rather than scalpels. Rather, government has long recognized that

19-10604                 Rosenbaum, J., Dissenting                 23

speech used by mental-healthcare providers as a treatment tech-
nique is still a healthcare treatment technique.  And so it has regu-
lated that speech as it is used as a healthcare treatment technique.
In sum, a "long . . . tradition" exists, *NIFLA*, 138 S. Ct. at 2372, of
regulating licensed professionals and their use of healthcare treat-
ment techniques—including talk therapy—to ensure compliance
with the applicable standard of care.

> 3.     *By misperceiving talk therapy as "not medical at all"*
>        *and mere "conversation," the panel opinion incor-*
>        *rectly effectively eradicates the states' ability to regu-*
>        *late talk therapy.*

Yet the panel opinion—without a single citation to support
its pronouncement—says talk therapy is "not medical at all" but is
a mere "conversation" like any other.  *Otto*, 981 F.3d at 866 n.3,
863; *see also id.* at 865 ("What the plaintiffs call a 'medical proce-
dure' consists—entirely—of words.").  That's like saying surgery is
"not medical at all" but is mere cutting and sewing like tailoring
clothing.[13]  The panel opinion's mischaracterization fails to appre-
ciate that people's health, and sometimes lives, are at stake when
licensed professionals perform healthcare treatment techniques—
whether they administer them through drugs, a scalpel, or words—
and that how they perform those techniques affects their clients'

---

[13] To be sure, tailoring clothing requires great skill (much more than I have).
But no one dies if a tailor makes a mistake sewing together a suit jacket.  And
that's one reason why doctors must be licensed, and tailors need not be.

24                    ROSENBAUM, J., Dissenting                    19-10604

health.   Indeed, unlike "political, social and religious debates,"
Conc. at 11, that is their purpose.

And so the panel opinion's invocation of the presumption
against content-based regulations and its application of strict scru-
tiny fail to account for the reality that states have long and tradi-
tionally recognized:   Talk therapy is a scientifically based
healthcare treatment technique—not regular speech—applied in
the confines of the mental-health-professional–client relationship,
for the sole purpose of treating a health condition. *Cf. Fla. Bar v.*
*Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("We have always been
careful to distinguish commercial speech from speech at the First
Amendment's core."). It is not a "political, social and religious de-
bate[]." Conc. at 11.

If the panel opinion were correct that talk therapy is "not
medical at all" and mere "conversation," no regulation of substan-
tive psychotherapy would be permissible. Any substantive regula-
tion of talk therapy is necessarily content-based and would not sur-
vive the general presumption against content-based regulations
and strict scrutiny, which govern normal speech. *Williams-Yulee*
*v. Fla. Bar*, 575 U.S. 433, 444 (2015) (emphasizing the "rare[ness]"
of "cases in which a speech restriction withstands strict scrutiny").
As the panel opinion points out, "[t]he 'mere assertion of a content-
neutral purpose' is not enough 'to save a law which, on its face dis-
criminates based on content.'" *Otto*, 981 F.3d at 862 (quoting
*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642–43 (1994)).

19-10604            ROSENBAUM, J., Dissenting            25

And because the panel opinion mistakenly views the treatment technique of talk therapy as "not medical at all" and mere "conversation," *Otto* misunderstands state regulations requiring licensed professionals to comply with the substantive standard of care when they administer talk therapy as a healthcare treatment as an impermissible "free-floating power to restrict the ideas to which [talk-therapy clients] may be exposed." *Otto*, 981 F.3d at 868 (citation and quotation marks omitted). But regulations requiring licensed professionals to adhere to the substantive standard of care when they perform talk therapy leave mental-healthcare providers free to speak with their clients, in any capacity other than as a healthcare professional administering a treatment technique, about matters that fall outside the talk-therapy standard of care.

Under *Otto*, though, the mental-healthcare psychotherapy landscape is a Wild West of anything goes—no matter how detrimental to clients' health. Regardless of how compelling the interest may be, states cannot exercise their police power to protect the public health and safety by requiring those licensed professionals who practice talk therapy to comply with the governing standard of care.

In fact, after the panel opinion, the state can't even revoke the license of a professional whose practice of talk therapy causes harm and death. That is so because, under the panel opinion, talk therapy is mere "conversation" and "not medical at all"—and we all agree that government can't stop people in general from having regular old "conversation[s]" about things that might come up in

talk therapy. So it is hard to see how anything would preclude a licensed professional whom the state seeks to discipline from invoking the First Amendment as a successful defense. And licensed professionals who perform talk therapy now operate with effective immunity, however deeply below the standard of care their therapy sinks.

Consider Erwin Chemerinsky's posited examples of "talk therapy" that states can't regulate, given the panel opinion's refusal to recognize talk therapy as a healthcare treatment technique: the mental-healthcare professional who "endanger[s] a person with anorexia by telling her 'you are too fat,' or . . . [the mental-healthcare professional who] treat[s] a condition such as 'female hysteria' that has long since ceased to be recognized by modern medical authorities as a psychiatric disorder." Erwin Chemerinsky, *"Gay Conversion" Therapy Is Not Protected Free Speech*, The Atlantic (Dec. 10, 2012), [https://www.theatlantic.com/national/archive/2012/12/gay-conversion-therapy-is-not-protected-free-speech/266102/](https://www.theatlantic.com/national/archive/2012/12/gay-conversion-therapy-is-not-protected-free-speech/266102/). I'll add another: the therapist who, as a part of talk "therapy," tells a client with suicidal ideation that he thinks the client is worthless and is better off dead. Regulation of all these practices necessarily requires review of the content of the words a mental-health professional uses to administer the healthcare treatment technique. So after the panel opinion, any regulation is subject to strict scrutiny, and states can't discipline for any these violations of the standard of care.

19-10604          ROSENBAUM, J., Dissenting          27

Nor may they now impose the very discipline that the Florida Department of Health Discipline and Administration has long meted out in cases like those I describe at pages 18 through 21 of this dissent.

The Concurrence conclusorily insists that is not so. *See* Conc. at 13–14 ("[T]hough *Otto* was published nearly two years ago, we have no indication that therapy has become 'a Wild West of anything goes—no matter how detrimental to clients' health.'"). It asserts—without any explanation as to how—that even after the panel opinion, states can revoke licenses and suspend professionals for these same types of failures to comply with the standard of care, and that states can bring criminal charges against licensed talk therapists who administer talk therapy whose content does not comply with the standard of care—all without running afoul of the panel's interpretation of the First Amendment.

But how? Neither the panel opinion nor the Concurrence even attempts to explain how states could constitutionally continue to engage in these activities in our Circuit now.

Take, for example, Florida Department of Health Discipline and Administration Action No. 2020-05957. As I mentioned, the Department disciplined the mental-health professional because he did not "discuss [with the suicidal patient] the patient's reasons to live, hope for the patient's future, coping skills the patient can engage in, and identify individuals the patient can turn to or a crisis number they can call if needed." *Id.* In other words, the state

28                    ROSENBAUM, J., Dissenting                    19-10604

punished the professional for violating the substantive standard of care, based necessarily on the *content* of the talk therapy he administered. *See Otto*, 981 F.3d at 862 ("One reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must 'examine the content of the message that is conveyed' to know whether the law has been violated.") (citation omitted).

Or consider Administration Action No. 2016-14260—where Florida disciplined a licensed social worker and marriage and family therapist for "[f]ailing to meet the minimum standards of performance in professional activities when measured against generally prevailing peer performance," in violation of Fla. Stat. § 491.009(1)(r), by, among other things, "utilizing incorporation therapy" in treatment and "failing to use a therapy approach in her treatment . . . [that] involved or encouraged increased interaction" between her client and the client's father. Again, to impose this discipline, Florida necessarily had to "'examine the content of the message that [was] conveyed,'" *Otto*, 981 F.3d at 862 (citation omitted), and then, based on that content, decide whether to take disciplinary action.

These professional disciplinary actions are no different from disciplining a licensed professional for "[f]ailing to meet the minimum standards of performance in clinical social work when measured against generally prevailing peer performance," in violation of Fla. Stat. § 491.009(l)(r), by "utilizing [SOCE] therapy." All these

19-10604          Rosenbaum, J., Dissenting          29

examples sanction a licensed professional because the content of the talk therapy they provided failed to comply with the standard of care. That is, all have the effect of "penaliz[ing] speech on the basis of that speech's content." *Otto*, 981 F.3d at 862. So if one cannot stand under the normal First Amendment rules, none can.

The Concurrence offers no explanation as to how that is not so. Instead, it merely points to the panel opinion and to *Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) (en banc); notes that since those opinions issued, Florida has disciplined mental-health professionals for engaging in talk therapy that did not comply with the standard of care; and conclusorily insists based solely on that one fact that "[t]he State did not lose its ability to regulate the medical profession simply because" of our holdings in those cases.[14] Conc. at 13.

---

[14] The Concurrence also asserts that "the parties [have not] raised the specter of thwarted health and safety regulation so vividly imagined by [me]." Conc. at 13–14. But actually, the Florida Psychological Association ("FPA") and the Florida Chapter of the American Academy of Pediatrics, Inc. ("FCAAP"), filed an amicus brief in support of the City and County's petition for rehearing en banc, worrying about exactly that. More specifically, the FPA noted that the panel opinion "incorrectly characterized psychotherapy as a forum for expressive speech[] [and] eliminated governments' authority to ensure compliance with professional norms." *See* Br. for FPA and FCAAP, as Amicus Curiae, at 3. And the FCAAP remarked that its "mission of promoting the highest standards of healthcare for children and young adults is undermined by the panel majority's effectively exempting psychotherapy from regulation." *Id.*

But that is no answer.

Even assuming the panel opinion went no further than *Wollschlaeger* (an invalid proposition, *see infra* at 41–46), as I have shown, past state enforcement actions violate the First Amendment under the panel opinion. And the mere fact that no licensed professional has challenged such regulations or administrative actions does not somehow magically render them constitutional under the First Amendment after the panel opinion. *Cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, __ S. Ct. ___, No. 20-843, 2022 WL 2251305, at *32 (Jun. 23, 2022) ("[B]ecause these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality.") For the same reasons, state criminal actions based on a licensed professional's failure to conform the content of his talk therapy to the governing standard of care fare no better. Nor does the Concurrence even try to explain how they could. No wonder. It can't.

This state of affairs makes licensed practitioners of talk therapy unique among healthcare providers in their insulation from state regulation of their use of the healthcare tool of their trade. And if the state can't hold these professionals to abide by the basic standard of care in their day-to-day practice, what is the point of licensing them at all? *See Barsky v. Bd. of Regents of Univ. of State of N.Y.*, 347 U.S. 442, 451 (1954) ("It is equally clear that a state's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing. Without continuing

supervision, initial examinations afford little protection."); *Dent*, 129 U.S. at 233 ("It would not be deemed a matter for serious discussion that a knowledge of the new acquisitions of the profession, as it from time to time advances in its attainments for the relief of the sick and suffering, should be required for continuance in its practice . . . .").

Yet that is precisely the result the panel opinion's position yields. That result defies years of state regulatory tradition, practice, and, as I have noted, Supreme Court precedent allowing states to regulate the substantive practice of healthcare professions.

It also defies common sense. The panel opinion simply cannot be right on this point. At the very least, we should all be very concerned that the panel opinion's conclusion that talk therapy is "not medical at all" and is mere "conversation" strips states of their ability to police mental-healthcare professionals who practice talk therapy within their borders. For this reason alone, this case demands en banc rehearing.

C.    Regulations that require licensed mental-healthcare professionals to comply generally with the governing standard of care are permissible content-based restrictions on speech.

As I have mentioned, the Supreme Court has identified two subcategories of "professional speech" for which the usual First Amendment rules do not apply and for which the government may issue content-based regulations: (1) laws that "require professionals to disclose factual, noncontroversial information in their

'commercial speech,'" *NIFLA*, 138 S. Ct. at 2372 (citations omitted), and (2) "regulations of professional conduct that incidentally burden speech," *id.* at 2373.

For purposes of this dissent, I assume without deciding that regulations that generally require licensed mental-healthcare professionals to comply with the standard of care in administering their healthcare treatment techniques (including talk therapy) don't qualify for either subcategory set forth in *NIFLA* as exempt from the regular First Amendment rules for content-based laws: non-controversial factual information and speech incidental to conduct.[15]    I pause here to emphasize that, contrary to the

---

[15] That said, good arguments can be made for why these regulations come within the subcategory of "regulations of professional conduct that incidentally burden speech." In *NIFLA*, the Supreme Court reviewed the category of content-based regulations of professional conduct that incidentally burden speech. 138 S. Ct. at 2373. In recognizing that the provisions in *Casey*, 505 U.S. 833, fell within that category, the *NIFLA* Court described *Casey* as holding that where a law "regulate[s] speech only 'as part of the *practice* of medicine, [it is] subject to reasonable licensing and regulation by the State.'" *NIFLA*, 138 S. Ct. at 2373.

As I've mentioned, talk therapy is a scientifically based mental-healthcare treatment technique practiced by licensed, specially trained and educated mental-health professionals, solely within the confines of the mental-health-professional–client relationship, for the singular purpose of treating their clients' mental-health conditions. Thus, its sole value lies in its ability to safely and efficaciously treat the client on whom it is administered. That makes talk therapy fundamentally just like any other healthcare treatment technique—such as surgery, for instance—that is not administered with words: its sole value rests in its ability to treat the patient's ailment (though in the case of surgery, of course, the ailment is physical instead of mental). So

19-10604          Rosenbaum, J., Dissenting                    33

Concurrence's mischaracterization of my dissent, *see* Conc. at 6 (asserting that "characterizing [talk therapy] as a 'scientifically based healthcare treatment technique' governed by a standard of care" and "[t]he professional setting of this speech [do] not transform it into conduct"), 8 ("Although Judge Rosenbaum 'concede[s]' that the talk therapy banned in this case is 'speech, not conduct,' one would not know it from the analysis that follows"), 12 (incorrectly suggesting my analysis is the same as that of the Ninth Circuit before *NIFLA* issued and suggesting that I argue licensed

---

talk therapy is just as much the "*practice* of medicine" as these other healthcare treatment techniques that are performed without words. Meanwhile, talk therapy is unmistakably different from speech engaged in for the purpose of "political, social, and religious debates." Conc. at 11. *See also*, *e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam) ("[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."); *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988) (holding that the circulation of a petition seeking a ballot initiative is an "interactive communication concerning political change that is appropriately described as 'core political speech'"); *Mills v. Alabama*, 384 U.S. 214, 2218 (1966) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . ."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting our "profound commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) ("[H]anding out leaflets in the advocacy of a politically controversial viewpoint [] is the essence of First Amendment expression[.]"). For another reason why government regulations requiring licensed mental-healthcare professionals to comply with the substantive standard of care may qualify under this exception as not subject to the usual content-based First Amendment rules, *see infra* at note 20.

professionals' administration of talk therapy is conduct, not speech), I do not argue here that regulations that generally require licensed mental-healthcare professionals to comply with the standard of care in administering their healthcare treatment techniques as those techniques employ speech are "regulations of professional *conduct* that incidentally burden speech," *NIFLA*, 138 S. Ct. at 2373 (emphasis added). Again, I'll concede for the purposes of this dissent that talk therapy is speech, not conduct.

Rather, I contend that speech used exclusively as a healthcare treatment technique by a licensed mental-healthcare professional in the course of administering that treatment technique comprises its own third subcategory of professional speech that is not subject to the usual presumption against content-based regulations.

This limited subcategory is a very narrow one. After all, the common-sense conclusion that the government may require licensed professionals who administer talk therapy to comply with the standard of care does not throw open the legislative doors to regulation of all so-called "professional speech." Talk therapy is unique among the speech professionals engage in while practicing their various professions (e.g., lawyers, accountants, general contractors). It's (1) scientifically based, (2) performed wholly within the confines of the licensed professional-client relationship, and, most significantly, (3) has as its only purpose the treatment of the client's health condition.

19-10604          ROSENBAUM, J., Dissenting          35

In this way, talk therapy is exactly like all non-speech-delivered healthcare treatment techniques that states require licensed healthcare professionals to provide in compliance with the governing standard of care. But it is entirely different from the services all non-healthcare professions offer.

And unlike with the states' regulation of most non-healthcare professions (but exactly like with the states' regulation of the rest of the healthcare profession), the states' ability to require compliance with the general standard of care for talk therapy stems from their police power to protect the public health and safety. Regulation of talk therapy is not "social and economic regulation," unlike the states' regulation of other professions.

In these important ways, talk therapy differs from other types of professional speech in which other professionals may engage in the practice of their professions. So any First Amendment principle applicable to the speech involved in talk therapy may be neatly and easily limited to regulations requiring licensed professionals to comply with the standard of care when they administer talk therapy.

In subsection 1 below, I argue that regulations that generally require licensed mental-healthcare professionals to comply with the governing standard of care in administering their healthcare treatment techniques (like talk therapy) are excepted from the First Amendment's usual rules for content-based laws. I then respond in subsection 2 to the Concurrence's criticism of my theory.

1. *Regulations that generally require licensed mental-healthcare professionals to comply with the substantive standard of care in administering talk therapy comprise a third exception to the regular First Amendment rules that govern content-based laws.*

Having explained how an exception for regulations requiring licensed professionals to comply with the substantive standard of care in administering talk therapy is readily limited to that discrete type of professional speech, I turn to why such regulations must comprise a third subcategory of "professional speech" for which the government can prescribe appropriate content-based regulations. Five reasons support this conclusion.

First, as I have noted, "a long . . . tradition" of state regulations requiring mental-healthcare providers to comply with the standard of care in administering talk therapy exists. *See NIFLA*, 138 S. Ct. at 2372. Though that "long . . . tradition" may have been "heretofore unrecognized," *id.*, there's no denying it. So such regulations satisfy the express terms of the test *NIFLA* identifies.

Second, states have a compelling interest in protecting the health and safety of their citizens from healthcare professionals to whom states grant their seal of approval through licensing. *Cf. Goldfarb*, 421 U.S. at 792. Indeed, health and welfare laws are generally "entitled to a strong presumption of validity." *Dobbs v. Jackson Women's Health Org.*, ___ U.S. ___, No. 19-1392, 2022 WL 2276808, at *42 (June 24, 2022).

Third, if regulations requiring mental-healthcare profession-als to comply with the standard of care could not be content-based, states would have no way to exercise their police power to protect the public health and safety as it relates to the substandard practice of talk therapy. That would make talk therapy unique as the only healthcare treatment technique that states could not require to comply with the governing standard of care. And that cannot be right—especially when we consider that talk therapy that does not comply with the standard of care can contribute to a client's death or serious harm. Yet the Supreme Court has recently said that states have "legitimate interests" in "respect for and preservation of . . . life[,]" "the elimination of particularly . . . barbaric medical procedures[,] [and] the preservation of the integrity of the medical profession." *Id.*

Fourth, talk therapy occurs wholly within the confines of the professional–client relationship, and its sole purpose is to treat the client on whom it is administered. In other words, assuming that talk therapy is considered pure speech, it is speech on "purely pri-vate matters" in a purely private context. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). The Supreme Court has recognized that "re-stricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of pub-lic interest . . . ." *Id.* That's because "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does

not pose the risk of a reaction of self-censorship on matters of public import." *Id.* (cleaned up).

Fifth, and for similar reasons, there is a significant common-sense difference between speech used by a licensed healthcare professional wholly to administer a healthcare treatment technique, on the one hand, and other varieties of speech, on the other. *Cf. Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985) (concluding that a meaningful "common-sense distinction [exists] between speech proposing a commercial transaction and other varieties of speech," and "commercial speech doctrine rests heavily" on that distinction (cleaned up)). And that common-sense difference warrants a carveout of the category of professionally practiced talk therapy from the scrutiny that generally applies to what might be described as regular speech. Mental-healthcare clients seek talk therapy from licensed professionals because clients want to address a mental-health concern, and they rely on licensed professionals' status as licensed professionals in trusting their treatment to these individuals. Clients do not visit licensed mental-healthcare providers because they want to have "political, social, and religious debates." Conc. at 11.

For all the reasons I've just explained, then, speech used by licensed professionals to administer the healthcare treatment technique of talk therapy to their clients must be subject to appropriate licensing and regulation by the state. *See NIFLA*, 138 S. Ct. at 2373.

> 2. *The Concurrence's critique of Section I of this dissent cannot withstand scrutiny.*

19-10604          ROSENBAUM, J., Dissenting          39

As I have mentioned, the Concurrence gets portions of my argument wrong. Below, I identify more of these mischaracterizations and show how, when they are corrected, the Concurrence's criticism disintegrates.

First, the Concurrence suggests that I propose a "'professional speech' ban[] just like the ones" the Supreme Court criticized in *NIFLA*. Conc. at 7. That's just not accurate. In *NIFLA*, the Supreme Court described *King v. Governor of New Jersey*,[16] *Pickup v. Brown*,[17] and *Moore-King v. County of Chesterfield*,[18] as having wrongly recognized "'professional speech' as a separate category of speech that is subject to different [First Amendment] rules." 138 S. Ct. at 2371. Significantly, the Court defined this category of "professional speech" as "any speech by ['individuals who provide personalized services to clients and who are subject to a generally applicable licensing and regulatory regime'] that is based on their expert knowledge and judgment, or that is within the confines of the professional relationship." *Id.* (cleaned up).

That is obviously a very broad category. It includes within its bounds the speech of all kinds of professionals—not just healthcare professionals. And it is much broader than and different from the narrow subcategory of speech I propose: speech used exclusively as a healthcare treatment technique by a licensed mental-

---

[16] 767 F.3d 216 (3d Cir. 2014).

[17] 740 F.3d 1208 (9th Cir. 2014).

[18] 708 F.3d 560 (4th Cir. 2013).

40                    ROSENBAUM, J., Dissenting                    19-10604

healthcare professional in the course of administering that treatment technique. As I've explained, *see supra* at 34–35, the limiting principle that governs this narrow subcategory does not ensnare within it any so-called "professional speech" other than talk therapy (or other speech as treatment or in aid of treatment) administered by a licensed healthcare professional within the confines of the healthcare professional–client relationship, for the sole purpose of treating the client's health condition.

So contrary to the Concurrence's criticism, Conc. at 5–8, an excepted subcategory that is cabined to talk therapy administered by licensed mental-health professionals accounts for the concern *NIFLA* identifies for not subjecting to content-based regulation the gargantuan category of all professional speech by any type of professional; it doesn't defy *NIFLA*. It also doesn't capture "teaching or protesting," "[d]ebating . . . [or] [b]ook clubs." *Otto*, 981 F.3d at 865; Conc. at 6. None of those things are healthcare treatments administered for the purpose of treating a client's health condition.

Nor does any power the government may enjoy to regulate these other activities generally stem from the police power to protect the public health. And unlike mental-healthcare treatment techniques practiced by licensed professionals, none of these things have a "long (if heretofore unrecognized) tradition" of content-based government regulation. So *NIFLA*'s rejection of the mammoth and undifferentiated category of "professional speech" as an exception to the First Amendment's usual presumption against

19-10604            Rosenbaum, J., Dissenting            41

content-based laws does not apply to the subcategory of speech I propose.

Second, the Concurrence contends that *Wollschlaeger*, 848 F.3d 1293, precludes the analysis I have set forth. *See* Conc. at 11–13. This criticism reflects a fundamental misunderstanding of both *Wollschlaeger* and *NIFLA*.

In *Wollschlaeger*, we considered the constitutionality of certain aspects of Florida's Firearms Owners' Privacy Act ("FOPA"). As relevant here, FOPA, on pain of disciplinary sanctions, precluded licensed healthcare professionals from asking their patients about firearm and ammunition presence in the home unless the professional in "good faith believe[d] that this information [wa]s relevant to the patient's medical care or safety, or the safety of others[.]" Fla. Stat. § 790.338(2). *Wollschlaeger*, 848 F.3d at 1302–03, 1305. Several physicians challenged the statute under the First Amendment. *Id.*

In evaluating the statute, we noted that the provision was "content-based." *Id.* at 1301. As *Wollschlaeger* predated *NIFLA*, we did not consider whether exceptions to the usual First Amendment rules might apply to the content-based prohibition on firearm inquiry. *See id.* Nor did we address whether strict scrutiny or heightened scrutiny applied to our analysis, since we determined that, the statute could not survive even heightened scrutiny. *Id.* Heightened scrutiny required us to consider whether the provision directly advanced "a substantial governmental interest and

42                    ROSENBAUM, J., Dissenting                    19-10604

[whether] the measure[] [was] drawn to achieve that interest." *Id.* at 1312 (cleaned up).

As relevant here, Florida identified its interest as "the need to regulate the medical profession in order to protect the public."[19] *Id.* at 1316. Though we recognized that Florida has "a substantial interest in regulating professions like medicine," we concluded that interest was "not enough" in *Wollschlaeger* to save the FOPA provision. *Id.*

We explained that Florida had made "no claim, much less [presented] any evidence, that routine questions to patients about the ownership of firearms are medically inappropriate, ethically problematic, or practically ineffective." *Id.* And we observed that there was "no contention (or, again, any evidence) that blanket questioning on the topic of firearm ownership [was] leading to bad, unsound, or dangerous medical advice." *Id.*

On the contrary, we emphasized, "[a] number of leading medical organizations" encouraged their members to ask about the presence of firearms in the home as part of childproofing the home, to educate patients about the dangers of firearms to children, to encourage patients to educate their children and neighbors about

---

[19] Florida also identified three other interests: (1) "protecting, from 'private encumbrances,' the Second Amendment right of Floridians to own and bear firearms," *id.* at 1312; (2) protecting patient privacy, *id.* at 1314; and (3) ensuring access to healthcare without discrimination or harassment, *id.* Because these interests are not directly relevant to the issue before the Court today, I do not discuss them further.

19-10604          ROSENBAUM, J., Dissenting          43

the dangers firearms can pose, and to routinely remind patients to use firearm safety locks, store firearms under lock and key, and store ammunition separately from firearms. *Id.* at 1301–02. So, we recognized, asking about firearms for preventative-care purposes was the standard of care. *See id.* at 1317 (referring to this as the "applicable standard of care"). And we found it significant that the FOPA provision *forbade* healthcare professionals from complying with that standard of care. *See id.* at 1317 (holding that Florida's interest in regulating the medical profession was not sufficient to satisfy heightened scrutiny, "[g]iven [among other things] that the applicable standard of care encourages doctors to ask questions about firearms (and other potential safety hazards)[]").

The differences between *Wollschlaeger* and this case are stark.

For starters, the FOPA provision in *Wollschlaeger* could not survive scrutiny because, among other reasons, while the state professed an interest in protecting the public health, FOPA could be understood to require licensed healthcare providers *to violate* the standard of care—and to do so based on no evidence that the standard of care was dangerous or medically wrong. I'm unaware of any "long (if heretofore unrecognized) tradition" of state laws that demand that licensed professionals intentionally fail to comply with a standard of care that is not dangerous or medically wrong. And it's difficult to imagine how such a law would fall within the state's police power *to protect* the public health and welfare.

Unlike the invalidated FOPA provision, the exception to the normal First Amendment rules I rely on requires licensed healthcare providers to comply with the standard of care (and to do so based on evidence)—exactly the type of regulation that states have long and traditionally imposed. So while a long tradition exists of government regulation requiring healthcare providers who use speech to administer healthcare treatment techniques to comply with the substantive standard of care, there's no tradition of government regulations requiring licensed healthcare professionals to violate the substantive standard of care.

That's not surprising, of course. Laws that require licensed healthcare professionals to violate the substantive standard of care would not satisfy even rational-basis scrutiny because they would not be "reasonable," the standard of scrutiny *Casey*, 505 U.S. at 884, applied to the *NIFLA* exception encompassed there.

The Concurrence misguidedly dismisses these distinctions as meaningless. *See* Conc. at 11–13. But the distinction between a long tradition of government regulation requiring healthcare professionals to comply with the standard of care in one case and the absence of any tradition of government regulation requiring healthcare professionals to violate the standard of care in the other is exactly the difference *NIFLA* said was meaningful. *NIFLA*, 138 S. Ct. at 2372 (explaining that speech could not be regulated "without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect"). And this distinction is the reason why regulations requiring licensed professionals to comply with the

substantive standard of care can fall into a *NIFLA* subcategory of reasonable and otherwise-permissible content-based regulations and the regulation at issue in *Wollschlaeger* never can. The meaningfulness of the other distinction is self-evident: laws that require compliance with the prevailing standard of care are reasonable while laws that require violation of that standard are not.

Plus, in *Wollschlaeger*, Florida's preclusion of compliance with the standard of care where Florida had made neither any claims nor presented any evidence to show that the standard of care was wrong or harmful, was not consistent with Florida's stated interest in "regulat[ing] the medical profession in order to protect the public." 848 F.3d at 1316. So it could not be justified as a proper exercise of the police power to protect the public health. On the other hand, when a healthcare treatment technique violates the standard of care and causes clients serious harm and even death, prohibiting its practice is consistent with the state's police power to protect the public health.

One last point: *Wollschlaeger*—issued before *NIFLA*—obviously did not have the benefit of *NIFLA*'s discussion of the overbroad category of "professional speech" and exceptions to the usual First Amendment rules. So it never considered whether—or rejected the notion that—any exceptions to the usual First Amendment presumption against content-based laws might apply.

For these reasons, my argument about a third subcategory of content-based exceptions to the usual First Amendment rules does not in any way conflict with *Wollschlaeger*.

II.   Laws that altogether prohibit licensed professionals from performing Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot be reliably obtained (and thus prohibit the administration of SOCE talk therapy on minors) do not violate the First Amendment.

For the reasons I've just described, this third subcategory of professional-speech regulation—laws requiring licensed professionals to comply with the substantive standard of care when they administer healthcare treatments through words—is excepted from the content-based usual First Amendment rules. So state and local governments can generally require licensed professionals to comply with the standard of care.

This section explains why, within that authority, state and local governments may prohibit licensed professionals from practicing, on populations from whom informed consent cannot reliably be obtained, treatment techniques that (1) do not meet the prevailing standard of care, (2) are not shown to be efficacious, and (3) are associated with a significant increase in the risk of death. For ease of reference, I call this category of speech that meets all of these criteria "Life-threatening Treatment Techniques."

Section A explains how informed consent can expand what treatments can be considered to comply with the standard of care. Section B discusses the unique problems of obtaining reliable informed consent from vulnerable populations in certain circumstances. And Section C shows that governments may prohibit the

practice of Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained and that SOCE is one such treatment technique.

A.    Under the standard of care (and under regulations that require compliance with it), licensed providers generally may be able, after obtaining proper informed consent, to administer talk therapy that otherwise would violate the standard of care.

The Supreme Court has expressly recognized the authority of the states to require licensed healthcare professionals to obtain informed consent from their clients before proceeding with healthcare treatment—even though doing so requires healthcare providers to speak certain words. *See Casey*, 505 U.S. at 881 ("Our prior decisions establish that as with any medical procedure, the State may require a woman to give her written informed consent to an abortion."). To obtain their clients' voluntary and informed consent to proceed, these laws require healthcare providers to inform their clients about the good, the bad, and the ugly of the healthcare treatment techniques they propose to use on them. As the Supreme Court has acknowledged, these types of laws "regulate[] speech only as part of the *practice* of medicine, subject to reasonable licensing and regulation by the State." *NIFLA*, 138 S. Ct. at 2373 (cleaned up). They therefore do not violate the First Amendment. *See id.*

Obtaining informed consent is not only often required by the law, but it is also the standard of care in healthcare treatment.

48                    ROSENBAUM, J., Dissenting                    19-10604

*See, e.g.*, Timothy J. Paterick, "Medical Informed Consent: General Considerations for Physicians," *Mayo Clinic Proceedings*, Vol. 83(3), 313 (Mar. 2008), https://www.mayoclinicproceedings.org/article/S0025-6196(11)60864-1/pdf (last visited July 15, 2022) ("Physicians need to understand informed medical consent from an ethical foundation, as codified by statutory law in many states, and from a generalized common-law perspective requiring medical practice consistent with the standard of care."); Erica S. Spatz, M.D., M.H.S., *et al.*, "The New Era of Informed Consent: Getting to a Reasonable-Patient Standard Through Shared Decision Making," *JAMA*, 2063 (2016), https://jamanetwork.com/journals/jama/fullarticle/2516469 (describing the obtaining of informed consent as a "well-ingrained ethical-legal process"); Daniel E. Hall, M.D., M. Div., *et al.*, "Informed consent for clinical treatment," *Canadian Med. Ass'n J.*, Mar. 20, 2012, v. 184(5), 533 ("Informed consent has become the primary paradigm for protecting the legal rights of patients and guiding the ethical practice of medicine."); "A Practical Guide to Informed Consent," https://landing.templehealth.org/ic-toolkit/html/ictoolkitpage5.html (last visited July 15, 2022) ("Informed consent is an ethical concept—that all patients should understand and agree to the potential consequences of their care—that has become codified in the law and in daily practice at every medical institution.").

I'll assume for the purposes of this dissent that, if the healthcare provider's disclosure of the healthcare treatment

19-10604                ROSENBAUM, J., Dissenting                    49

technique is accurate and complete and the client still knowingly and voluntarily agrees to undergo the technique, the healthcare provider generally does not violate the standard of care by administering that technique to the client—even if the treatment technique itself would otherwise violate the substantive standard of care.[20]

---

[20] Because the standard of care demands healthcare professionals who administer healthcare techniques that violate it first obtain informed consent, laws requiring licensed professionals to comply with the substantive standard of care are effectively laws requiring licensed professionals to obtain informed consent if they perform healthcare treatment techniques that do not comply with the substantive standard of care.  This fact is another reason a strong argument can be made that regulations that require licensed mental-healthcare professionals who administer talk therapy to comply with the substantive standard of care qualify as permissible content-based regulations of speech incidental to the conduct of practicing medicine, in accordance with the *Casey* exception.  *See supra* at note 15; *see also Casey*, 505 U.S. at 881 (recognizing that "with any medical procedure, the State may require a [client] to give her written informed consent").  When we view as informed-consent regulations those regulations requiring licensed mental-healthcare professionals to comply with the substantive standard of care in administering talk therapy, that also distinguishes them from any kind of regulations of "teaching or protesting," "[d]ebating . . . [or] [b]ook clubs." *Otto*, 981 F.3d at 865; Conc. at 6.  And prohibiting the practice of talk therapy on vulnerable populations for which informed consent cannot reliably be obtained is simply a consequence of the inability to reliably obtain informed consent.  Again, though, while I note these facts, the argument in my dissent assumes that laws that require licensed professionals to comply with the substantive standard of care when they administer talk therapy do not fall into the *Casey* category.

50                    ROSENBAUM, J., Dissenting                    19-10604

### B.    Informed consent to SOCE talk therapy cannot be reliably obtained from minors.

But for some treatments that do not meet the standard of care, informed consent cannot be reliably obtained from populations who are uniquely vulnerable for reasons unrelated to the nature of the treatment.

Take SOCE talk therapy, for example. Unemancipated minors are generally entirely reliant on their parents for their shelter, food, and day-to-day living environments. Caitlin Ryan, *et al.*, "Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents: Implications for Young Adult Mental Health and Adjustment," *J. of Homosexuality* 1, 3 (Nov. 7, 2018), https://www.utah.gov/pmn/files/513643.pdf. Not only that, but children often crave their parents' acceptance and love. So parents who disapprove of their child's sexual orientation or gender identity have several strings they can easily and forcefully pull to coerce their child to undergo SOCE. *Id.* ("SOCE with minors raises distinct ethical concerns. These include determining what constitutes appropriate consent, the potential for pressure from parents and other authority figures, the minor's dependence on adults for emotional and financial support, and the lack of information regarding the impact of SOCE on their future health and wellbeing."); *cf.*, *e.g.*, Hannah Clay Wareham, *Survivor: MIT grad student remembers 'ex-gay' therapy* (Aug. 25, 2011),

19-10604              ROSENBAUM, J., Dissenting                 51

https://providence.edgemedianet-
work.com/story.php?ch=news&sc=local&id=123810&survi-
vor:_mit_grad_student_remembers_%22ex-gay%22_therapy (re-
porting that a 12-year-old whose father inflicted injuries on him
that landed him in the hospital "seven times in quick succession"
after he admitted to his father that he had same-sex attractions sub-
mitted to physical conversion therapy to appease his parents).

The Q Christian Fellowship reported that "[s]ome youth
have told [the] Trevor [Project] that, after coming out to their par-
ents as LGBTQ, their family members responded by threatening to
cut off contact and support unless they agreed to attend conversion
therapy." Q Christian Fellowship, *supra*, at 12. And "[o]thers have
been estranged from family, with the restoration of relationships
conditioned explicitly on their consent to attempt to change." *Id.*
As a result, "too many youth feel[] like conversion therapy might
be their 'only' option." *Id.*

By definition, minors in this situation cannot give consent
because their submission to SOCE is coerced. *Cf. Schneckloth v.
Bustamonte*, 412 U.S. 218, 228 (1973) (noting that consent cannot
be coerced for Fourth and Fourteenth Amendment purposes); Fla.
Stat. § 794.011(1)(a) (defining "consent" as used in Florida Statutes
chapter on sexual battery as "intelligent, knowing, and voluntary
consent and does not include coerced submission"). But as a prac-
tical matter, it's obviously not possible to preclude licensed profes-
sionals from performing SOCE talk therapy on only coerced mi-
nors because many of them will not reveal the coercion for the

same reasons that they are coerced into submitting to SOCE in the first place.

Nor is it any answer to say that the parents are the ones who must provide their informed consent. *Att'y ad Litem for D.K. v. Parents of D.K.*, 780 So. 2d 301, 310 (Fla. Dist. Ct. App. 2001) ("We recognize the tension apparent in the law between the rights and responsibilities of parents and the rights of children. Certainly, to promote strong families, parents should be involved and active in the lives of their children, including their health care, for which the parents are held responsible. Unfortunately, sometimes the parents are the cause of abuse, both emotional and physical, of their children."). After all, we are talking about an affirmative purported healthcare "treatment" with no proven benefits and significant life-threatening consequences to the child client—who is the only one who must endure the technique and its consequences—without their consent. *See, e.g.*, Caitlin Ryan, *supra*, at 9 ("Results from this study clearly document that parent/caregiver efforts to change an adolescent's sexual orientation are associated with multiple indicators of poor health and adjustment in young adulthood."). Plus, courts have recognized minors' rights in their relationships with their therapists. *See, e.g.*, *Att'y ad Litem for D.K.*, 780 So. 2d at 301 (holding in the circumstances of the case that minor child's parents were not entitled to either assert or waive the psychotherapist-patient privilege on their minor child's behalf).

C.    Government can adopt, as a subset of permissible laws regulating treatment techniques that do not comply with the

substantive standard of care, regulations prohibiting the practice of Life-threatening Treatment Techniques on those from whom consent cannot reliably be obtained.

When performed by licensed professionals for the purpose of addressing a health condition, talk therapy—even talk therapy that is not proven efficacious and is associated with a significant increase in death—is still, at least in name, a healthcare treatment technique. And the government's ability to regulate licensed professionals' practice of the healthcare treatment technique of talk therapy—regardless of the talk therapy at issue—still arises from its police power to protect the public health and safety. *See Dobbs*, 2022 WL 2276808, at *42 (observing that "health and welfare laws [are] entitled to a 'strong presumption of validity'") (internal citation omitted). It would make little sense if the government's ability to protect the public health and safety from talk therapy because it did not comply with the standard of care extended to only disciplining licensed professionals after they had used life-threatening and unproven types of talk therapy, but not to protecting vulnerable populations from being subjected against their will to such treatment techniques in the first place.

Indeed, the government has a legitimate (actually, compelling) interest in protecting the health and safety of these vulnerable populations from the practice of purported talk therapy administered solely to address a client's health condition—but that (1) doesn't conform to the standard of care, (2) is not shown to be efficacious, and (3) is associated with a significantly increased risk of

death.  (As a reminder, I refer to talk therapy with these three characteristics as "Life-threatening Treatment Techniques.")  After all, the Supreme Court has said that "respect for and preservation of prenatal life" is a legitimate and substantial governmental interest. *Dobbs*, 2022 WL 2276808, at *42; *see also Casey*, 505 U.S. at 876 (characterizing states as having "a substantial interest in potential life").  So respect for and protection of the lives of children who already walk this earth must be at least that as well.  To be sure, the Supreme Court has recognized as much in upholding state laws prohibiting physician-assisted suicide.  *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (recognizing the state's "unqualified interest in the preservation of human life") (citation and quotation marks omitted).  And laws that prohibit the performance of Life-threatening Treatment Techniques by licensed professionals on vulnerable populations from which informed consent cannot reliably be obtained certainly are reasonable and can be narrowly drafted to further a compelling interest.

In this section, I will show that (1) the category of laws requiring compliance with a standard of care includes (as a subset) laws prohibiting Life-threatening Treatment Techniques; (2) the definition of Life-threatening Treatment Techniques has legally ascertainable guardrails; (3) laws regulating Life-threatening  Treatment Techniques must be (at least) "reasonable" but could also survive heightened scrutiny; and (4) SOCE therapy is a Life-threatening Treatment Technique and so a law prohibiting its practice on

19-10604            Rosenbaum, J., Dissenting            55

those from whom informed consent cannot reliably be obtained does not violate the First Amendment.

> 1.    *Laws that prohibit licensed professionals from performing Life-threatening Treatment Techniques for which informed consent cannot reliably be obtained are a subset of laws requiring licensed professionals to comply with the substantive standard of care.*

As I have explained, the law has long had a tradition of regulations that require licensed healthcare professionals—including mental-healthcare professionals—to comply with the substantive standard of care in administering their treatment techniques ("Standard-of-Care Compliance Laws"). The laws at issue here—which prohibit licensed healthcare professionals from practicing Life-threatening Treatment Techniques for which informed consent cannot reliably be obtained—necessarily compose a subset of these Standard-of-Care Compliance Laws.

Put another way, obtaining informed consent is an essential part of the standard of care when the healthcare treatment technique would otherwise violate the standard of care.[21] But for some identifiable vulnerable populations, informed consent cannot reliably be obtained. So it necessarily follows that practicing Life-threatening Treatment Techniques (which always require

---

[21] Of course, informed consent is often required, regardless of the healthcare treatment technique.

informed consent) on populations from whom informed consent cannot reliably be obtained will always violate the standard of care.

And government may prohibit the practice of these Life-threatening Treatment Techniques on vulnerable populations. In fact, the Supreme Court upheld a law in *Glucksberg* that had essentially that effect, though it was challenged on substantive-due-process grounds, not on a First Amendment basis.

In *Glucksberg*, several physicians wished to treat their ailing clients' terminal pain by assisting them in committing suicide. 521 U.S. at 707. They challenged a state ban on assisted suicide as unconstitutional, asserting a violation of their patients' alleged substantive-due-process liberty interest in "determining the time and manner of one's death." *Id.* at 722.

The Supreme Court upheld the ban. It observed that state law had long recognized that "[i]f one *counsels* another to commit suicide, and the other by reason of the advice kills himself, the advisor is guilty of murder as principal." *Id.* at 714 (citation and quotation marks omitted) (emphasis added).

Then the Court noted that consent makes no difference. *See id.* at 716 (stating that under the Model Penal Code, "the interests in the sanctity of life that are represented by the criminal homicide laws are threatened by one who expresses a willingness to participate in taking the life of another, even though the act may be accomplished with the consent, or at the request of the suicide victim") (citation and quotation marks omitted). As the Court

19-10604                ROSENBAUM, J., Dissenting                57

explained, "all admit that suicide is a serious public-health problem, especially among persons in otherwise vulnerable groups," and "[t]he State has an interest in preventing suicide, and in studying, identifying, and treating its causes." *Id.* at 730. Indeed, the Court continued, "[r]esearch indicates . . . that many people who request physician-assisted suicide withdraw that request if their depression and pain are treated." *Id.*

The Court explained that "legal physician-assisted suicide could make it more difficult for the State to protect depressed or mentally ill persons, or those who are suffering from untreated pain, from suicidal impulses." *Id.* at 731. As the Court reasoned, "the State has an interest in protecting vulnerable groups . . . from abuse, neglect, and mistakes." *Id.* And that is certainly the case when the vulnerability results in a "real risk of subtle coercion and undue influence" in life-and-death decisions. *Id.* at 732. "The risk of harm is greatest for the many individuals in our society whose autonomy and well-being are already compromised by . . . membership in a stigmatized social group." *Id.* (citation and quotation marks omitted). For these reasons, the Court concluded, "[t]he State's interest [in prohibiting physician-assisted suicide] goes beyond protecting the vulnerable from coercion; it extends to protecting disabled and terminally ill people from prejudice, negative and inaccurate stereotypes, and 'societal indifference.'" *Id.* (citation omitted).

Separately, the Court also acknowledged the state's "interest in protecting the integrity and ethics of the medical profession." *Id.*

58                ROSENBAUM, J., Dissenting                19-10604

As support, the Court cited medical authorities and noted that "the American Medical Association, like many other medical and physicians' groups, has concluded that '[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as healer.'" *Id.* (citation omitted).

I hope that *Glucksberg*'s implicit conclusion—that the State has an interest in regulating what medical professionals can say to their patients so that the patients don't kill themselves—sounds familiar. *Glucksberg* proves that states have long been able to prohibit and have, in fact, prohibited healthcare providers from administering Life-threatening Treatment Techniques—even when they are administered solely through speech (such as counseling how to commit suicide as a treatment for pain)—on vulnerable populations from whom informed consent cannot reliably be obtained.

The Concurrence criticizes my reliance on *Glucksberg* because it was not a First Amendment case. *See* Conc. at 8. It misses the point. *Glucksberg* shows—in painstakingly tracing back to the common law the government's ability to prohibit physicians from assisting in suicide—that government has always precluded physicians from engaging in certain life-threatening treatment techniques conducted entirely through speech.

Even the Concurrence does not suggest that, had the law in *Glucksberg* been challenged on First Amendment grounds, it would have been held unconstitutional. Of course, it wouldn't have because there's a "long (if *heretofore unrecognized*) tradition," *NIFLA*, 138 S. Ct. at 2372 (emphasis added and cleaned up),

of government's ability to regulate physicians by prohibiting them from providing the healthcare treatment technique of assisting in suicide, even just verbally (In fact, that is essentially the same reason the Court dismissed the *Glucksberg* plaintiffs' substantive-due-process claim: "history, legal traditions, and practices.")  And that "long (if heretofore unrecognized) tradition" is the same one into which government's ability to prohibit mental-healthcare providers from administering Life-threatening Treatment Techniques to those from whom informed consent cannot reliably be obtained falls.

> 2.    *Safeguards can ensure that laws that prohibit licensed mental-healthcare professionals from performing Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained are, in fact, motivated by real and significant medical concerns.*

Even though states can regulate what a physician can say to a patient, the Supreme Court has understandably expressed concern that the government should not be able to "manipulate the content of doctor-patient discourse to increase state power and suppress minorities."  *NIFLA*, 138 S. Ct. at 2374 (cleaned up).  So any law that prohibits the practice of Life-threatening Treatment Techniques on a vulnerable population must, in fact, be motivated by real and significant medical concerns about the inefficacy of and life-threatening dangers associated with the technique, as well as by a legitimate reason why informed consent cannot be reliably

60                    ROSENBAUM, J., Dissenting                    19-10604

obtained from that vulnerable population (i.e., a compelling government interest). And while *Glucksberg* was not a First Amendment case, a review of it nonetheless is helpful in identifying three guardrails to ensure these concerns are accounted for.

First, *Glucksberg* focuses on the informed opinion of the healthcare community. *See Glucksberg*, 521 U.S. at 731. That makes sense. Healthcare professionals are the experts on sound healthcare practice. They are the ones with the years of healthcare knowledge. And they are the ones who are scientifically trained and have studied and practiced healthcare. Judges, as a general rule, have not. So healthcare professionals' expertise, knowledge, research, and standards establish the applicable standard of care and set the threshold for research establishing that a technique is not shown to work and that it significantly increases the risk of death. And because we are talking about the prohibition of Life-threatening Treatment Techniques on certain vulnerable populations, any standard of care that disapproves of the Life-threatening Treatment Technique must be uniformly endorsed by all leading professional bodies within whose jurisdiction the matter falls and who have issued a position statement on the practice.

The Concurrence asks, "Which professional bodies qualify as 'leading'"? Conc. at 10. Our precedent shows that we have not previously thought that to be a difficult question. In fact, we—in an en banc decision, no less—have referred to the American Medical Association, the American Academy of Pediatrics, and the American Academy of Family Physicians as examples of "leading

19-10604          Rosenbaum, J., Dissenting          61

medical organizations." *See Wollschlaeger*, 848 F.3d at 1301–02, 1316. And we even characterized as the "standard of care" what these "leading medical organizations" said about healthcare practice. *See id.* at 1317; *see also Glucksberg*, 521 U.S. at 732 (discussing the views of leading medical organizations).

But to be more precise, objective factors reflecting longstanding respect within the healthcare community make an organization a "leading" one. These include having many members (relative to the number of individuals who would be eligible to join), being established for a long time, and enjoying other objective indicia of expertise and respect in the discipline. To explain what I mean by that last factor, I am talking about the role that a professional organization may play in its field—like the American Medical Association's role (through its part in the Liaison Committee on Medical Education) in accrediting medical schools, *see* https://www.ama-assn.org/system/files/2019-10/lcme-resp.pdf; or the American Counseling Association's Code of Ethics, which as we have previously recognized, *see Keeton v. Anderson-Wiley*, 664 F.3d 865, 869 (11th Cir. 2011), the Council for Accreditation of Counseling and Related Educational Programs, requires educational counseling programs to adopt and teach, *see* http://www.cacrep.org/wp-content/uploads/2015/07/Guiding-Statement-for-2016-CACREP-Standard-1.O..pdf; or the American Psychiatric Association's issuance of the *Diagnostic and Statistical Manual of Mental Disorders*, *see* https://www.psychiatry.org/psychiatrists/practice/dsm, which is used by professionals

around the world to diagnose mental conditions; or the World Health Organization's publication of the *International Classification of Diseases*, *see* https://www.who.int/standards/classifications/classification-of-diseases, which healthcare providers around the world rely on in, among other things, assessing and monitoring the safety, efficacy, and quality of health care.

The Concurrence also wonders, "Who defines the 'jurisdiction' of those 'leading professional bodies'?" Conc. at 10. Of course, an element of common sense informs these decisions to some extent: We would not expect an organization that consists solely of podiatrists, for example, to have jurisdiction over mental-healthcare treatments. But more to the point, again, objective factors determine whether a discipline falls within a professional body's jurisdiction. Among these are whether a significant number of members of the organization regularly use the healthcare treatment at issue, whether the healthcare treatment falls within the disciplines of healthcare that members regularly practice, and whether other objective indicators show that the organization is considered an authority on healthcare treatments within the category under review. *See Glucksberg*, 521 U.S. at 732 (discussing the views of leading medical organizations).

Second and relatedly, *Glucksberg* suggests that the standard of care in question must be supported by research on the matter. *See id.* at 730–31 (relying on research showing that "many people who request physician-assisted suicide withdraw that request if their depression and pain are treated"). So it only makes sense that

19-10604              ROSENBAUM, J., Dissenting              63

besides acceptable research showing the technique is associated with a significant increase in the risk of death, a lack of respected research showing efficaciousness is also necessary (or respected research proving the technique is not efficacious).[22]

What is acceptable depends on the problems in testing dangerous treatment techniques. We must keep in mind the ethical limits of clinical research that prohibit conducting or continuing clinical studies of techniques shown to endanger clients without providing proven benefits. *See, e.g.*, American Psychological Association, *Ethical Principles of Psychologists and Code of Conduct*, https://www.apa.org/ethics/code ("Psychologists take reasonable steps to avoid harming their clients/patients, . . . research participants, . . . and to minimize harm where it is foreseeable and unavoidable."); *cf. F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) ("There are some propositions for which scant empirical evidence can be marshaled . . . . One cannot demand a multiyear controlled study, in which some children are intentionally

---

[22] The Concurrence opines that under my analysis, "this Court would have been required to uphold government bans on talk therapy that encouraged ideas about gender identity and sexual orientation that fell outside the social orthodoxy of [earlier eras]." Conc. at 11. Not so. Objectively, the current standard of care for talk therapy administered to address any distress an LGBTQ person might experience would not have qualified as a Life-threatening Treatment Technique. Among other reasons (and unlike with SOCE talk therapy), there is no evidence that current treatment techniques are or have ever been associated with a significant (or any) increase in the death rate on those on whom they are administered.

64                ROSENBAUM, J., Dissenting                19-10604

exposed to indecent broadcasts (and insulated from all other inde-
cency), and others are shielded from all indecency.  It is one thing
to set aside agency action under the Administrative Procedure Act
because of failure to adduce empirical data that can readily be ob-
tained.  It is something else to insist upon obtaining the unobtaina-
ble.") (internal citation omitted).  Within those bounds, we must
insist on the most rigorous research possible.

        And third, *Glucksberg* suggests that informed consent must
be unable to mitigate the dangers of the Life-threatening Treat-
ment Technique within the universe of clients on whom the law
prohibits the practice of the Life-threatening Treatment Tech-
nique.  So in *Glucksberg*, the Court recognized that, with respect
to physician-assisted suicide, clients who were depressed, were ter-
minal, or were in great pain might be especially vulnerable.  521
U.S. at 731–32.  And those who were "poor, . . . elderly, [or] disa-
bled" were at "real risk of subtle coercion and undue influence."
*Id.* at 732.  Put another way, informed consent may not be viable
when it is both impossible to ensure consent is voluntary, and a
significant risk exists that "consent" is coerced.

        Once a government concludes that a particular type of talk
therapy qualifies as a Life-threatening Treatment Technique for
which informed consent cannot be reliably obtained from a vulner-
able population, it should publicly identify it (as well as the vulner-
able population) to provide notice to licensed professionals.  And it
should identify the evidence on which it relies to reach the conclu-
sion that a type of talk therapy so qualifies.

19-10604            Rosenbaum, J., Dissenting            65

Adherence to these guiderails ensures regulations that are directed to prohibiting Life-threatening Treatment Techniques are so drawn because of their health effects—not their content—even though government must review the content of the talk therapy to determine whether a licensed mental-healthcare professional has violated the substantive standard of care. *Cf. Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989) (recognizing that prison regulations precluding prisoner receipt of periodicals "solely because [their] content is religious, philosophical, political, social or sexual, or because [their] content is unpopular or repugnant" were, "[o]n their face," content-based, but upholding them as "neutral" because the reason for drawing these categories was rationally and legitimately based on "their potential implications for prison security").

The Concurrence frets that when a law prohibiting licensed mental-healthcare professionals from practicing Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained comes before the courts, judges will have to make factual findings about which organizations are leading bodies with jurisdiction over the treatment technique and whether the standard of care is adopted by all such groups and is properly supported by acceptable research. *See* Conc. at 10. But judges (and juries) engage in factfinding all the time. Judges find facts to decide whether to issue a preliminary injunction, *see McDonalds Corp v. Robertson*, 147 F.3d 1301 (11th Cir. 1998); to resolve bench trials, *see* Fed. R. Civ. P. 52; and to

66                    ROSENBAUM, J., Dissenting                    19-10604

sentence, *United States v. Charles*, 757 F.3d 1222, 1225 (11th Cir. 2014). Juries also find facts all the time. *Apprendi v. United States*, 530 U.S. 466 (2000). In all those contexts, we affirm jury and district court findings—not based on absolute certainty—but based on sufficient evidence. The Concurrence offers no reason why courts are unable in this context to evaluate whether the same types of factual findings sufficiently support the government's decision to preclude licensed mental-healthcare professionals from practicing Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained.

Ultimately, there is a long (if heretofore unrecognized) tradition of government regulations requiring mental-healthcare providers to comply with the substantive standard of care. And within that category, a long (if heretofore unrecognized) tradition also exists of government regulations prohibiting mental-healthcare providers from violating the substantive standard of care when they cannot reliably obtain informed consent from their clients to practice Life-threatening Treatment Techniques. For these reasons alone, laws that satisfy the requirements I have discussed do not violate the First Amendment.

3.    *Laws that prohibit licensed healthcare professionals from practicing Life-threatening Treatment Techniques on those from whom informed consent cannot reliably be obtained can survive rational-basis and heightened scrutiny.*

19-10604          Rosenbaum, J., Dissenting                67

Having identified the third subcategory of professional speech exempt from the usual content-based First Amendment rules—speech used as a healthcare treatment technique—as well as attendant guardrails, I now address the level of scrutiny to apply to regulations of such speech. Laws that require mental-healthcare providers to comply with the substantive standard of care or to refrain from administering Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained survive even heightened scrutiny.

To get the ball rolling, I first again note that I am not arguing that laws prohibiting the practice of Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot reliably be obtained fall within the second *NIFLA* exception for laws that incidentally burden speech.[23] But because I am fleshing out a third *NIFLA* exception, it is instructive to consider the type of scrutiny the Supreme Court applied to the laws within the first and second *NIFLA* exceptions.

With respect to the first *NIFLA* exception—laws that "require professionals to disclose factual, non-controversial

---

[23] As a reminder *NIFLA* identified two explicit exceptions: (1) laws that "require professionals to disclose factual, non-controversial information in their 'commercial speech,'" *NIFLA*, 138 S. Ct. at 2372 (citations omitted), and (2) "regulations of professional conduct that incidentally burden speech," *id.* at 2373. *NIFLA* explained that *Casey*'s informed-consent law fell into the latter exception and regulations under that exception needed to be only "reasonable." *Id.*

information in their 'commercial speech,'" *NIFLA*, 138 S. Ct. at 2372 (citations omitted)—the Supreme Court noted "such requirements should be upheld unless they are 'unjustified or unduly burdensome.'" *Id.* (citation omitted). And in *Zauderer*, the case that applied the exception, the Court explained that "rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. This standard appears to be a less demanding version of heightened scrutiny.

As for the second *NIFLA* exception—speech incidental to the practice of medicine, as in *Casey*—the Supreme Court held that the informed-consent requirement at issue there was "a reasonable measure to ensure an informed choice." 505 U.S. at 883. The Court's use of the term "reasonable" suggests it was applying rational-basis scrutiny to the informed-consent regulations.

But we don't need to decide whether laws in the third *NIFLA* exception I identify are subject to rational-basis scrutiny or heightened scrutiny because such laws survive heightened scrutiny. For that reason, I'll assume that the *Casey* Court was applying a harder standard to satisfy (some form of heightened scrutiny), and the word "reasonable" reflects a determination that a law must be reasonable, given (1) the strength of the state's interest at stake, (2) the manner in which the regulation furthers that interest, and (3) any costs of the regulation.

Even under a more demanding version of heightened scrutiny, a law prohibiting licensed professionals from practicing Life-

threatening Treatment Techniques on those from whom informed consent cannot reliably be obtained easily satisfies these criteria.

First, as I have mentioned, the government's interest in protecting the lives of those already walking this earth—especially children—is perhaps the preeminent compelling government interest.

Second, a law prohibiting the practice of Life-threatening Treatment Techniques on those from whom informed consent cannot reliably be obtained is narrowly tailored. The law aims to eliminate the negative health effects of the treatment techniques subject to it but prohibits their practice on only those people from whom informed consent cannot reliably be obtained because of characteristics unrelated to the treatment technique. So under such a law, licensed professionals are still free to perform the technique on any client that does not fall into the limited category of those from whom informed consent cannot reliably be obtained. And they are likewise at liberty to debate and advocate for—indeed, to say anything they wished about—the treatment technique anywhere outside the context of administering healthcare treatment techniques to a member of the identified vulnerable group from which informed consent cannot reliably be obtained. In other words, practitioners can advocate for the technique, study the technique, debate the technique *practice* the technique—except on the few people who can't meaningfully consent. That's a narrow, specific, and tailored prohibition. And it's not clear to me that, as a practical matter, there is any narrower way to enforce prohibition of the practice of Life-threatening Treatment Techniques on only

those members of the vulnerable population who have, in fact, been coerced into receiving the technique.

Third, when we get right down to it, the value of a treatment technique lies solely in its ability to improve a client's health condition. So it is hard to see how a law that prohibits the practice of only those techniques that have not been shown to be efficacious yet are associated with a significant increase in risk of death could hold much, if any, value. And prohibiting their practice by license mental-healthcare professionals, on vulnerable populations from whom informed consent cannot reliably be obtained, inflicts little, if any cost when it comes to the reason for seeking treatment in the first place.

In short, such a law can easily pass even heightened scrutiny.

The Concurrence criticizes my reliance on the two *NIFLA* exceptions in identifying the standard of scrutiny that applies here. *See* Conc. at 9. But the whole point of the two *NIFLA* exceptions is that the Supreme Court has declined to apply strict scrutiny to content-based regulations that fall within such exceptions.

That leaves only rational-basis scrutiny or some form of heightened scrutiny that must apply if a law that regulates professional speech comes within a "long (if heretofore unrecognized) tradition" of permissible laws. I have assumed the harder standard to satisfy, heightened scrutiny—and the more demanding version of that—would apply here. I've also shown that laws prohibiting the practice of Life-threatening Treatment Techniques by licensed

mental-healthcare professionals on clients from whom informed consent cannot be reliably obtained could pass such scrutiny. In short, when properly recognized as comprising their own third *NIFLA* category, laws prohibiting the practice of Life-threatening Treatment Techniques by licensed mental-healthcare professionals on clients from whom informed consent cannot be reliably obtained pass constitutional muster.

4.      *SOCE talk therapy is a Life-threatening Treatment Technique for which informed consent is not able to be reliably obtained for practice on minors.*

To explain these principles in practice, I show how laws that prohibit the practice of Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot be reliably obtained would preclude the practice of SOCE on minors.

First, as I have noted, the leading professional bodies within whose jurisdiction talk therapy falls uniformly condemn SOCE talk therapy. *See supra* at note 5.

Second, studies and position statements show that SOCE talk therapy has not been shown to be efficacious, and it has been associated with risks of significant harm—including a more than doubling of suicidal ideation and suicide attempts—to those on whom it is administered, particularly youths.[24] *See id.*; *see also*

---

[24] The Concurrence criticizes my reliance on these reputable sources as "out of bounds." *See* Conc. at 4. It misses the point. My purpose in dissenting is to show how the panel opinion's misunderstanding of talk therapy as "not

72                    ROSENBAUM, J., Dissenting                    19-10604

medical at all" and mere "conversation" precludes *any* substantive regulation of the practice of talk therapy—no matter how strong the evidence that a treatment technique is life-threatening and inefficacious.  For that reason, I rely on the most current (and overwhelming) evidence about the standard of care and the benefits and dangers of talk therapy.  But if the Concurrence wants to talk about what's in the record—something the panel opinion failed to do (even though it did not first find the district court's factual findings clearly erroneous), *see* Jordan Dissent—nothing there supports its position that talk therapy is "not medical at all" and mere "conversation," either.  On the contrary, the record contains additional significant evidence that is entirely consistent with the more recent sources I cite.  For example, the City and County, in promulgating their Ordinances relied on an American Academy of Pediatrics Journal article from 1993 that stated, "Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in sexual orientation"; the American Psychiatric Association's December 1998 statement opposing any psychiatric treatment, including SOCE, "which therapy regime is based upon the assumption that homosexuality is a mental disorder per se or that a patient should change his or her homosexual orientation"; the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation's systematic review of peer-reviewed journal literature on SOCE, which cited "research that sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people"; the American Psychological Association's 2009 resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts, "advising parents, guardians, young people, and their families to avoid [SOCE]"; the American Psychoanalytic Association's June 2012 position statement on SOCE stating that "psychoanalytic technique 'does not encompass purposeful attempts to "convert," "repair," change or shift an individual's sexual orientation, gender identity or gender expression,' such efforts being inapposite to 'fundamental principles of psychoanalytic treatment . . . .";  the American Academy of Child & Adolescent Psychiatry's 2012 Journal article stating that clinicians should be aware that there is "no evidence that sexual orientation can be altered through therapy and that attempts to do so may be harmful"; that there is "no medically valid

19-10604               Rosenbaum, J., Dissenting                    73

*supra* at note 3; Przeworski, *supra*.  For example, as I have noted, for each of the past three years (2019, 2020, 2021), the Trevor Project has conducted its National Survey on LGBTQ Youth Mental Health, in which it has surveyed between 34,000 and 40,000 individuals.  Each one of these studies has shown that LGBTQ youth who were subjected to SOCE "reported more than twice the rate of attempting suicide in the past year compared to those who were

---

basis for attempting to prevent homosexuality, which is not an illness"; and that such efforts may, among other things, "undermine . . . important protective factors against suicidal ideation and attempts"; and that SOCE "carr[ies] the risk of significant harm" and is "contraindicated"; the Pan American Health Organization's 2012 statement that SOCE "constitute[s] a violation of the ethical principles of health care and violate[s] human rights that are protected by international and regional agreements" and that SOCE "lack[s] medical justification and represent[s] a serious threat to the health and well-being of affected people"; the American School Counselor Association's 2014 position statement that says, "Professional school counselors do not support efforts by licensed mental health professionals to change a student's sexual orientation or gender as these practices have been proven ineffective and harmful"; the Substance Abuse and Mental Health Services Administration's 2015 report "Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth, which states, "based on scientific literature that [SOCE] efforts to change an individual's sexual orientation, gender identity, or gender expression is a practice not supported by credible evidence and has been disavowed by behavioral health experts and associations, . . . that such therapy may put young people at risk of serious harm"; the American College of Physicians' 2015 position paper opposing the use of SOCE because "[a]vailable research does not support the use . . . as an effective method in the treatment of LGBT persons.  Evidence shows that the practice may actually cause emotional or physical harm to LGBT individuals, particularly adolescents or young persons."

74                    ROSENBAUM, J., Dissenting                    19-10604

not." 2019, 2020, 2021 Trevor Project Surveys, *supra*. A United Kingdom government assessment of SOCE recently confirmed the same thing: SOCE was "associated with self-reported harms among research participants who had experienced conversion therapy for sexual orientation and for gender identity—for example, negative mental health effects like depression and feeling suicidal." GOV.UK, *An assessment of the evidence on conversion therapy for sexual orientation and gender identity* (Oct. 29, 2021), https://www.gov.uk/government/publications/an-assessment-of-the-evidence-on-conversion-therapy-for-sexual-orientation-and-gender-identity/an-assessment-of-the-evidence-on-conversion-therapy-for-sexual-orientation-and-gender-identity ("UK Assessment"). A smaller study in 2018 showed between a doubling and a tripling of suicide attempts in youths subjected to SOCE. *See* Caitlin Ryan, *supra*.

At the same time, SOCE has not been shown to be effective. *See* Amy Przeworski, *supra*; *see also* UK Assessment, *supra* ("[T]here is no robust evidence that conversion therapy can achieve its stated therapeutic aim of changing sexual orientation or gender identity"); *see also supra* at note 5. And the studies reflecting the dangers of SOCE talk therapy are based on a quality of evidence "likely to be the highest possible given inherent constraints. More methodologically-robust research designs, such as randomi[z]ed control trials, are not possible." UK Assessment, *supra*. Of course, that's the case because mental-health professionals, who are sworn to do no harm, cannot, within their ethical code,

19-10604               ROSENBAUM, J., Dissenting               75

purposely expose children to a technique that is not known to have any proven benefits but is associated with more than doubling their risk of suicide.

Third, as I have mentioned, informed consent cannot adequately address the dangers of SOCE talk therapy in minors. *See supra* at Section II.B.

Fourth, and finally, I emphasize that, as regulations of licensed mental-healthcare professionals, laws like these would proscribe only licensed professionals' performance of Life-threatening Treatment Techniques such as SOCE.[25]  They would not preclude the licensed professionals to whom they apply from speaking about or advocating for SOCE talk therapy in any way.  Nor would they preclude licensed professionals from practicing talk therapy on those over 18—that is, those the law presumes may be responsible for their own care.

Laws like these can isolate the problem—the involvement of licensed professionals in administering a mental-healthcare treatment technique to minors who cannot provide voluntary consent for a technique that has no proven benefits and a significant increase in the risk of death—and excise only that.  In this way, laws of this type are both reasonable and reasonably necessary to advance the government's compelling interest in protecting the lives of minors from Life-threatening Treatment Techniques for which

---

[25] This group includes unlicensed individuals who perform talk therapy as part of their professional training to become licensed professionals.

minors' consent cannot be reliably obtained. So laws proscribing the practice of Life-threatening Treatment Techniques on a vulnerable population can pass what is essentially heightened scrutiny (but for content-based laws for which a long tradition of regulation exists).

For all these reasons, laws that prohibit licensed professionals from practicing Life-threatening Treatment Techniques on vulnerable populations from whom informed consent cannot be reliably obtained do not violate the First Amendment.

III.    Conclusion

States have long been able to constitutionally require their licensed healthcare providers to comply with the standard of care to maintain their licenses. For good reason. The states' police power to protect the public health and safety would mean little if the healthcare professionals they license—thereby giving their stamp of approval—could regularly practice substandard care and inflict serious harm and even death on their clients without even a reprimand. Contrary to the panel opinion, the government's ability to regulate licensed substandard healthcare providers does not change just because the vehicle for administering the treatment technique happens to be words.

And more specifically, the government may also preclude licensed healthcare professionals from practicing, on vulnerable populations from whom informed consent cannot be reliably obtained, talk therapy that all leading professional bodies agree

violates the standard of care because it is associated with more than doubling the risk of death and has not been shown to be efficacious. Laws of this type are reasonable and reasonably necessary to protect the lives of minors, and no other viable option exists for the government to protect these populations from such potentially Life-threatening Treatment Techniques.

A single young person who tries to kill themselves is one too many; it cannot be the case that thousands of kids must be sacrificed in the name of the First Amendment when laws that prohibit such practices by licensed professionals still allow anyone—including licensed professionals—to say whatever they please about such techniques both within and outside the professional-client relationship, as long as they do not practice the technique on their minor clients. And states—which have a compelling interest in protecting the health and safety of the public from unsafe practices of state-licensed health professionals—should not be forced to be a party to these dangerous and unproven practices by being unable to regulate them among the healthcare professionals to whom they give their licensing seal of approval.

The sole purpose of administering a healthcare treatment technique—whether with a scalpel, drugs, or words—is to improve the client's health, not to engage in "social, political, and religious debates." And it is antithetical to that purpose for licensed professionals to engage in a practice on their young clients that has repeatedly been shown to be associated with more than doubling the risk of death and has not been shown to be efficacious. Precluding

78                    ROSENBAUM, J., Dissenting                    19-10604

licensed healthcare professionals from subjecting their minor clients to such techniques, while not interfering at all with the professionals' ability to discuss, debate, or advocate for those techniques, therefore does not violate the First Amendment.

Because the panel opinion's misunderstanding of talk therapy as "not medical at all" and mere "conversation" precludes the possibility that state and local governments will ever be able to regulate Life-threatening Treatment Techniques in this Circuit, I respectfully dissent from the denial of rehearing en banc.